COMMONWEALTH *vs.* LYNNETTE BUCHANAN.

Suffolk.  May 5, 1981. — July 22, 1981.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Search and Seizure,* Consent.  *Constitutional Law,* Search and seizure,
Waiver of constitutional rights.  *Waiver.*

On a motion to suppress physical evidence seized from an apartment oc-
cupied by the defendant in a criminal case, and certain incriminating
statements made by her to police officers, the Commonwealth carried
its burden of proving that the defendant voluntarily consented to a
police search of the apartment, and that her statements to police on
two subsequent noncustodial occasions at the apartment were free of
any taint because her will was not overborne.  [106-108]

INDICTMENT found and returned in the Superior Court
Department on February 14, 1980.

A pretrial motion to suppress evidence was heard by
*Ronan, J.*

An application for an interlocutory appeal was allowed
by *Liacos, J.,* in the Supreme Judicial Court for the county
of Suffolk, and the appeal was reported by him.

*Andrew Good* for the defendant.

*Kevin Connelly,* Assistant District Attorney, for the Com-
monwealth.

NOLAN, J.  A single justice of this court, acting under
Mass. R. Crim. P. 15 (b) (2), 378 Mass. 884 (1979), granted
the defendant's interlocutory application for leave to appeal
the trial judge's denial of her motions to suppress physical
evidence and certain statements given by the defendant to
police officers.  There has not yet been a trial on the indict-
ment for murder in the first degree of John L. Bowie.  We
affirm the order of the judge denying the motions.

We learn from the judge's careful findings of fact, rul-
ings, and conclusions that the narrative starts on Janu-

ary 13, 1980, when police of district three of the Boston police department (Dorchester section) received information that one Georgiana Sims, also known as Gloria Stokes, an escapee from the Massachusetts Correctional Institution at Framingham, could be found at 160 Westview Street, apartment 403, Dorchester, at approximately 5 P.M. The information about Sims included a warning that she might be carrying a gun and that she was considered dangerous. At the time of her escape she was serving a sentence for manslaughter. The police obtained a description of her. About the time the information concerning Sims was being relayed, the same police officers received a telephone report from a passerby that a man had been stabbed by a woman at the traffic lights not far from Franklin Field, near the intersection of Westview and Stratton Streets.

About 3:50 P.M. the police arrived at the scene of the stabbing. They learned that John L. Bowie, a fireman, had been stabbed and was being transported to Carney Hospital in fire rescue apparatus. Police officers went to Carney Hospital to interview Bowie, but he was then undergoing surgery. Shortly thereafter, Bowie died.

Police Sergeant James Wilson, the patrol supervisor, reported for work at 4 P.M. and was given a briefing on the details of the stabbing as well as on the status of Georgiana Sims. Wilson learned from another police officer that Sims could be found at 4:30 P.M. at 240 Westview Street in apartment 8, which was under lease from the Boston Housing Authority to Marsha Maupin, the defendant's mother. He directed police officers to meet him there. Wilson, accompanied by six police officers, entered 240 Westview Street and went to apartment 8. He knocked, and the defendant responded by asking, "Who is it?" or words of similar import. Wilson answered, "I am a police officer. We are looking for Georgiana Sims also known as Gloria Stokes. We have a warrant." The defendant asked, "Who?" Wilson repeated the name. The defendant opened the door and Wilson stepped inside the apartment. He again asked about the escapee and the defendant responded by assuring him that

there was no such person living there. Wilson asked, "Can we look around?" The defendant said that he could search after assuring him that only she and her children were there. During the search, one of the police officers observed a shotgun under a bed in a rear bedroom. He seized it and turned it over to Wilson. It was unloaded. The police were in the apartment for seven to ten minutes. Their entry was peaceful. No guns were drawn and the judge found that the defendant "exhibited a calm, cool and collected demeanor." On leaving, Wilson told the defendant that he wanted to see her mother or her mother's boyfriend about the shotgun, which he took along with him.

About one hour later, the police at district three received an anonymous telephone call from a female who told them that it was Michele Maupin (defendant's sister) who had stabbed Bowie, and that she could then be found in apartment 8 at 240 Westview Street.

Wilson again went to the apartment with a number of officers and knocked on the door. At first, there was no response; then the defendant responded. Wilson said: "It is the police; we are looking for a Michele Maupin. She is wanted in connection with a stabbing. We understand she is inside and we want to look around." The defendant replied: "She isn't here." She told the police to go away — that she would not open the door. Thereupon, Wilson told her that he would obtain a search warrant if she persisted in her refusal, that other police officers would be outside the door, that if she were harboring or aiding Michele Maupin, she "could get in trouble" and that if they found Michele Maupin in the apartment on their return, she (defendant) might be charged.

The defendant then agreed to permit them entry and she opened the door. Wilson and the other officers entered peaceably and looked about the apartment for Michele Maupin but they did not find her. Wilson told the defendant that Michele was wanted for questioning in connection with the stabbing death of Bowie. The defendant's response to Wilson's declaration about Bowie was self-incriminating. She "appeared anxious and concerned." During

this visit, the defendant made a telephone call outside the hearing of the police. After a few moments, the police departed.

On the following morning, two detectives returned to the apartment and, without any opposition, they interrogated the defendant concerning the whereabouts of Michele Maupin. Some of her responses were self-incriminating.

The judge concluded that the Commonwealth had carried its burden of proving that the defendant consented to the first search and that the second and third encounters in which the defendant made incriminating statements were free of any taint because her will was not overborne. See *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974). We agree. We can review the judge's conclusion that the defendant voluntarily and intelligently consented to the police entries and to the conversations with the officers but we treat it deferentially. *Commonwealth* v. *Doyle*, 377 Mass. 132, 138 n.6 (1979), noted with approval in *Commonwealth* v. *Meehan*, 377 Mass. 552, 557 (1979), cert. dismissed, 445 U.S. 39 (1980). See *Commonwealth* v. *Angivoni*, 383 Mass. 30, 33 (1981). Furthermore, we carefully scrutinize a "defendant's claim that his apparent consent was involuntary . . . to avoid giving him an unfair advantage." *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 177 (1980), quoting from *Commonwealth* v. *Harmond*, 376 Mass. 557, 562 (1978).

1. *First visit.* When the defendant opened the door she knew that there was a police officer seeking entry to search for Georgiana Sims. Wilson did not try to dupe her. He said that he had a warrant which he did have, but did not try to mislead her into believing that he had a search warrant or an arrest warrant for her. In this material respect, the defendant's reliance on *Bumper* v. *North Carolina*, 391 U.S. 543 (1968), is misplaced. There was sufficient evidence to support the judge's finding of consent by the defendant to the search which ultimately revealed the shotgun. Her consent was "unfettered by coercion, express or implied" and it was more than "mere acquiescence to a

claim of lawful authority." *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976), quoted with approval in *Commonwealth* v. *Harmond*, 376 Mass. 557, 561 (1978). It is true that the police did not advise the defendant of her right to refuse to consent to the search, but this neglect is only one factor in assessing the voluntariness of consent. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 226-227 (1973). *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496-497 (1976). In light of the substantial deference due the determinations of the judge, we are unprepared to hold that the consent given by the defendant was involuntary as a matter of law.[1]

2. *Second visit.* When the police arrived for the second encounter, the defendant was behind a closed door. At the outset, she was reluctant to open the door, but she soon opened it. The judge concluded that the gesture of opening the door was "indicative of demonstrating her election of free choice." The announcement by Wilson that he would obtain a search warrant was not fatal to her free exercise of volition. See *Commonwealth* v. *Mendes*, 361 Mass. 507, 512 (1972). She herself was not then under suspicion and, as the judge correctly noted, she knew that she could insist on a warrant. See *Commonwealth* v. *Deeran*, 364 Mass. 193, 196 (1973). The statement that police would remain outside the door and that she might be charged if they found Michele Maupin inside the apartment adds nothing to the defendant's case. The judge found that the defendant was a mature person, twenty-one years old, without mental defects or deficiencies. She exercised her free choice, undisturbed by drugs or alcohol. She made a telephone call undisturbed by the police. She was not then arrested. Her will was not

---

[1] In the recent decision of *Steagald* v. *United States*, 451 U.S. 204, 211-216 (1981), the Court held that a police officer may not legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant. However, the Court also acknowledged the right of a householder to consent to a warrantless search. Accordingly, *Steagald* does not preclude our holding in the instant case.

overborne, nor was her capacity for self-determination critically impaired. See *United States* v. *Watson,* 423 U.S. 411, 424 (1976); *Schneckloth* v. *Bustamonte,* 412 U.S. 218, 225 (1973). We are satisfied that, in the totality of the circumstances, her consent was voluntary.

No warnings prescribed under *Miranda* v. *Arizona,* 384 U.S. 436 (1966), were given to the defendant during any one of the three visits. These warnings are required when the defendant is subjected to custodial interrogation. *Miranda, supra* at 444. It cannot be said that the defendant during any of these confrontations was subject to custodial interrogation as that phrase has been interpreted in *Oregon* v. *Mathiason,* 429 U.S. 492, 494-495 (1977), and *Beckwith* v. *United States,* 425 U.S. 341, 345-347 (1976).

3. *Third visit.* The defendant's argument as to the impropriety of this interrogation is based entirely upon the claimed vices of the first two visits. There was no search on the third visit but there was interrogation. Our conclusion that the first two visits (including the searches and interrogations) were without taint, leads necessarily to our approbation of the third visit. The doctrine of the fruit of the poisonous tree or primary illegality, as it is sometimes denominated, is not implicated if the tree is not poisonous. See *Brown* v. *Illinois,* 422 U.S. 590, 598-599 (1975); *Wong Sun* v. *United States,* 371 U.S. 471, 478 (1963). Cf. *Commonwealth* v. *Fielding,* 371 Mass. 97, 113-114 (1976).

The order denying the motions to suppress is affirmed.

*So ordered.*