COMMONWEALTH *vs.* DANIEL ROGERS.

Hampden. January 4, 2005. - May 16, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Consent.

Discussion of the legal principles applicable under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights in circumstances where police officers rely on consent to justify a warrantless search. [236-239]

The evidence at a hearing on a criminal defendant's pretrial motion to suppress controlled substances found in plain view by police officers after entering his apartment warranted a finding that no consent to enter was given, where the police officers did not unambiguously request to enter the apartment or offer any explanation of their purpose and, even if the indeterminate reaction by the person who answered the door amounted to consent for the police to enter the apartment, such consent was not sufficiently voluntary to comply with the requirements for a warrantless search. [239-247] GREANEY, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on October 15, 2002.

A pretrial motion to suppress evidence was heard by *Judd J. Carhart, J.*

An application for leave to prosecute an interlocutory appeal was allowed by *Spina, J.*, in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court. The Supreme Judicial Court on its own initiative transferred the matter from the Appeals Court.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

*Brownlow M. Speer,* Committee for Public Counsel Services, for the defendant.

COWIN, J. The Commonwealth appeals from an order entered in the Superior Court suppressing cocaine, heroin, and marijuana seized by the police from the defendant's apartment. After the

door to the apartment was opened by a woman, the police entered the apartment and the drugs were observed in plain view. The judge held an evidentiary hearing and entered a memorandum of decision and order in which he ordered suppression of the drugs. A single justice of this court granted the Commonwealth leave to pursue an interlocutory appeal from the judge's order in the Appeals Court, see Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996), and we transferred the case to this court on our own motion.

In his decision, the motion judge implicitly assumed that the woman who answered the door consented to the police entry, but ruled that she lacked actual authority to consent and that there was insufficient evidence for the police reasonably to believe that she had apparent authority. As explained below, we affirm the order suppressing the Commonwealth's evidence, but we do so for reasons other than those relied on by the judge. We do not reach the questions of actual or apparent authority which he decided, for we conclude that the evidence did not establish even that the woman at the door consented to the entry.[1]

1. *Facts.* We summarize the judge's findings of fact.[2] On August 21, 2002, at approximately 4:40 A.M., Officer Joshua Ellsworth of the Springfield police department encountered a woman who was crying. When the officer asked her if she needed assistance, the woman identified herself and said that she had gone to "Danny's apartment" to buy crack cocaine. She told the officer that, after she had paid for the drugs, Danny and a woman named "Rose" had assaulted her and taken back the drugs. The victim described the apartment to the officer.

---

[1] The Commonwealth maintains that the defendant has waived the issue whether the woman's consent to enter was voluntarily given. The defendant did not waive this issue as he raised it at the conclusion of the hearing on the motion to suppress as well as in his posthearing memorandum. In any event, an appellate court may affirm a ruling on an alternative legal theory if supported by the record and the findings. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997), and cases cited. The judge's findings are sufficient to permit us to reach our conclusion.

[2] Although the judge's findings are "binding in the absence of clear error," we may reexamine his conclusions of law. See *Commonwealth* v. *Alvarado*, 420 Mass. 542, 544 (1995), quoting *Commonwealth* v. *Bottari*, 395 Mass. 777, 780 (1985).

Ellsworth concluded that "Danny" was the defendant, Daniel Rogers, and that "Rose" was a woman he had seen in Rogers's company. Ellsworth had been to Rogers's apartment (which was approximately two and one-half blocks from where he met the woman) at least ten times during the past year in response to complaints of drug use, fights, and prostitution. Because of his frequent visits, the officer recognized the layout of the defendant's apartment as described by the woman.

Ellsworth and two other officers, all in uniform, proceeded to Danny's apartment. Ellsworth knocked on the door and a woman he recognized as Rose Hopkins opened the door. Several other people were also inside the apartment. The officer asked where he could find Rogers. Rose and two other unidentified individuals pointed in the direction of the kitchen. Due to his familiarity with the apartment, the officer knew that the kitchen was in the rear of the apartment. He walked through the living room area to the back of the apartment where he found Rogers seated at a table. A large pile of what Ellsworth recognized as crack cocaine was on the table in front of Rogers.[3] The police seized the cocaine and also some marijuana that was on a nearby shelf. It was later determined that the seized contraband also included heroin.

The defendant was indicted for possession with intent to distribute cocaine as a subsequent offense, G. L. c. 94C, § 32A (c) and (d); violation of the controlled substance laws in, on, or near a school or park zone, G. L. c. 94C, § 32J; possession of a class A substance (heroin), G. L. c. 94C, § 34; and possession of a class D substance (marijuana), G. L. c. 94C, § 34.

2. *Discussion.* Warrantless entries into the home are prohibited by the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights absent either probable cause and exigent circumstances, or consent. See *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Derosia*, 402 Mass. 284, 286, cert. denied, 488 U.S. 980 (1988); *Commonwealth* v. *Pietrass*,

---

[3]There is no dispute that the evidence was in plain view once the officers entered the kitchen area of the apartment. See *Commonwealth* v. *Pietrass*, 392 Mass. 892, 901 n.12 (1984), citing *Commonwealth* v. *Hason*, 387 Mass. 169, 176 (1982).

392 Mass. 892, 897 (1984). The reason for the rule against warrantless entry "is to protect the physical integrity of the home from warrantless police intrusion." *Commonwealth* v. *Sanna*, 424 Mass. 92, 96 n.9 (1997). In the present case, the Commonwealth does not justify its entry of the defendant's home based on probable cause and exigent circumstances; thus the only issue for consideration is whether the police had consent to enter the defendant's home. When the police rely on consent to justify a warrantless entry, under both the Fourth Amendment and art. 14, the prosecution "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper* v. *North Carolina*, 391 U.S. 543, 548 (1968). See *Commonwealth* v. *Walker*, 370 Mass. 548, 554-555, cert. denied, 429 U.S. 943 (1976), citing *Bumper* v. *North Carolina, supra*; *Commonwealth* v. *Sanna, supra* at 97; *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496 (1976). Because entry based on consent is an exception to the constitutional warrant requirement, "the Commonwealth must show 'consent unfettered by coercion, express or implied, and also something more than mere "acquiescence to a claim of lawful authority." ' " *Commonwealth* v. *Voisine, supra* at 783, quoting *Commonwealth* v. *Walker, supra* at 555. See *Bumper* v. *North Carolina, supra* at 549-550; *Commonwealth* v. *Robinson*, 399 Mass. 209, 217 (1987). See also *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 228 (1973) ("the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means . . . . For, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed")[4]; *Commonwealth* v. *Sanna, supra* at 96-97. Although consent may be implicit, see *Commonwealth* v. *Voisine, supra*,

---

[4]While the Court in *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 229 (1973), declined to require that the prosecution "affirmatively prove that the subject of the search [or entry] knew that he had a right to refuse consent," i.e., that a waiver be "knowing and intelligent," *id.* at 235, the Court reaffirmed that "the Fourth and Fourteenth Amendments require that [the prosecution] demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied" and that "[v]oluntariness . . . be determined from all the circumstances." *Id.* at 248-249. Just as the *Bustamonte* Court was concerned that requiring a "knowing and intelligent" waiver would create "artificial restrictions" on police conduct, so too was it mindful

and the police need not utter any "magic words" of request before entering, the Commonwealth must establish that the occupant's words or conduct amounted to something other than mere acquiescence to a claim of authority or simple resignation to the perceived power of uniformed officials.

The voluntariness of an individual's consent to a warrantless entry is an issue of fact, and must be examined in light of the totality of the circumstances of the case. See *Schneckloth* v. *Bustamonte, supra* at 248-249; *Commonwealth* v. *Sanna, supra* at 97. Ordinarily, in cases involving consent to enter a defendant's home, entry is preceded by an exchange in which a police officer makes some type of inquiry of an occupant, and in response, the occupant verbally or physically reacts in a manner that is interpreted as "consent." See, e.g., *Commonwealth* v. *Voisine, supra* at 776. Whether consent is voluntary depends on the nature of this interaction between the police and the occupant. *Commonwealth* v. *Walker, supra* ("In considering all the circumstances, we must take into account not only the conduct of the police but also the conduct and statements of persons inside the apartment prior to the police entry"). In meeting its burden of establishing voluntary consent to enter, the Commonwealth must provide us with more than an ambiguous set of facts that leaves us guessing about the meaning of this interaction and, ultimately, the occupant's words or actions. See *Schneckloth* v. *Bustamonte, supra* at 228-229, quoting *Boyd* v. *United States*, 116 U.S. 616, 635 (1886) (consent by coercion "can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right"). See also *United States* v. *Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979) ("existence of consent to a search [or entry] is not lightly to be inferred"); *Commonwealth* v. *Marquez*, 434 Mass. 370, 374 (2001), quoting *Commonwealth* v. *Forde*, 367 Mass. 798, 805 (1975) ("The right of police officers to enter into a home, for whatever purpose, represents a serious governmental intrusion into one's privacy"). If either the of-

that "[t]o approve such searches [or entries] without the most careful scrutiny would sanction the possibility of official coercion." *Id.* at 229.

ficer's request or the occupant's response is so ambiguous that we are unable to discern whether the occupant voluntarily consented to entry, our inquiry will be over and the entry must be deemed unlawful. Thus, "[w]e must first determine whether [Rose's] actions could reasonably be interpreted to manifest consent to the officers' entry into the apartment. Once the existence of a consent by conduct is determined, its voluntariness must be examined." *United States* v. *Griffin*, 530 F.2d 739, 743 (7th Cir. 1976). See *Robbins* v. *MacKenzie*, 364 F.2d 45, 48 (1st Cir.), cert. denied, 385 U.S. 913 (1966) (first examining whether evidence warranted finding that occupant expressed consent to entry, then whether consent was coerced).

a. *Ambiguity.* With the requirements discussed above as our guide, we must first determine whether, based on the circumstances of the interaction between Rose and the police, Rose consented to the entry. We consider the exchange at issue in the present case in chronological order, first analyzing the officer's request of the occupant, and then considering her response. All Officer Ellsworth asked Rose was where he could find the defendant. This question can be interpreted narrowly as merely a question concerning the whereabouts of the defendant, more broadly as including a request to enter the premises, or as an expression of the officers' intention to enter the defendant's home, regardless of the occupants' response and irrespective of whether they were given permission to do so. Rose's response of stepping back and pointing toward the kitchen similarly may be construed in more than one way: as strictly an indication of the defendant's location, or as a manifestation of Rose's permission for the officers to enter to speak with the defendant in the kitchen. Thus, at the very outset of our analysis, the ambiguity of both the officers' and Rose's words and actions makes it difficult to discern whether there was actual consent in this case. See *United States* v. *Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990) (to infer voluntary consent from occupant's actions in walking toward officers in hallway, then walking back into apartment and leaving door open in response to inquiry from officer about whereabouts of suspect, would be "conjecture"); *Holmes* v. *State*, 347 Ark. 530, 540 (2002) (occupant's opening door and stepping back in response to question about where of-

ficers could talk with occupant was marked by "uncertainty and lack of clarity" and did not constitute consent to enter). The dissent, through inference, would disregard the indeterminate nature of the interaction at issue and conclude that Rose's "gesture . . . [was] neither ambiguously or equivocally conveyed." *Post* at 250 (Greaney, J., dissenting). We simply cannot not infer so much from so little.

Where courts have found that an occupant's gesture or her stepping aside or back from a threshold amounts to consent to enter, these actions have often been in response to what could reasonably be construed as a request to enter by the police or an explicit disclosure of their purpose. The more precise information and requests provided by the officers in these cases, which are absent in the present case, serve to clarify the meaning of the occupants' reactions as manifestations of their consent for the police to enter. For example, in *Robbins* v. *MacKenzie, supra* at 49, only after the police officer knocked and identified himself and stated his purpose did the occupant make a "responsive gesture of invitation" by unlocking and opening the door and walking back into the room. In construing the gesture as a voluntary invitation to enter, the United States Court of Appeals for the First Circuit emphasized the significance of the officer having first "fully and honestly informed [the occupant] of [his] objective[]." *Id.* Officers' more explicit requests have served to elucidate occupants' responsive gestures in other cases. See *United States* v. *Carter*, 378 F.3d 584, 587-588 (6th Cir. 2004), cert. denied, 125 S. Ct. 1298 (2005) (finding consent where officers explicitly asked to enter hotel room and speak with occupant and occupant then stepped back and "cleared a path" for officers to enter); *United States* v. *Griffin*, *supra* at 741, 743 (only after rejecting officers' first request to enter apartment and in response to second request to enter did occupant "step[] back, leaving the door open, and [lead] the officers into the apartment"); *United States* v. *Ramirez-Chilel*, 289 F.3d 744, 746-747 (11th Cir. 2002), cert. denied, 537 U.S. 1114 (2003) (police stated purpose and requested entry prior to occupant's "yield[ing] the right-of-way"); *United States* v. *Zabala*, 52 F. Supp. 2d 377, 385 (S.D.N.Y. 1999) (officer testified that he asked "if [he and other officers] can take a look

inside," and in response, occupant unlocked and opened door with her key). The instant case, characterized by the absence of a request to enter or any explanation of the officers' purpose, and only an indeterminate reaction by Rose, is distinguishable from these cases.

b. *Voluntariness.* Even should we assume that Rose's actions were an unambiguous signal allowing the police to enter the apartment, the Commonwealth has failed to satisfy its burden of proof that Rose's alleged consent was sufficiently voluntary to comply with the requirements for a warrantless search. It was between 4:40 A.M. and 5 A.M. when Rose opened the door to find three uniformed officers standing at the threshold. Cf. *Commonwealth* v. *Harmond*, 376 Mass. 557, 561-562 (1978) (although not conclusive, "presence of several uniformed officers . . . may suggest the absence of consent" in context of warrantless search). According to the undisputed testimony, the officers were armed. They did not identify themselves before or while knocking on the door, and it is likely Rose was unaware of their identity until after she opened the door. As the officers never stated their purpose, Rose probably did not know at the time she pointed whether the officers merely intended to question Danny, or whether they came to arrest him or search the home. Contrast *Robbins* v. *MacKenzie, supra* at 48-49.

In the circumstances of this case, the Commonwealth has failed to demonstrate that Officer Ellsworth's question concerning the defendant's whereabouts was not a demand for entry, and that Rose's response thereto was anything other than "mere acquiescence" to a claim of authority. See *Johnson* v. *United States*, 333 U.S. 10, 12-13 (1948) (consent invalid as "granted in submission to authority rather than as an understanding and intentional waiver of a constitutional right" where defendant "stepped back acquiescently" and admitted police into hotel room); *United States* v. *Edmondson*, 791 F.2d 1512, 1514, 1515 (11th Cir. 1986) (defendant's response of stepping back and putting hands on head in response to demand, "FBI. Open the door," was merely "acquiescence to a show of official authority," not consent for agents to enter). Contrast *Commonwealth* v. *Sanna*, 424 Mass. 92, 94, n.2, 97-98 (1997) (consent "freely and voluntarily given" where, in response to request for permis-

sion to enter house to ask defendant questions, defendant's father "invited the officers into the house, telling them 'Come on inside,' gestur[ed] toward the door of the house, and [led] the officers . . . into the living room"; he testified that "he neither feared the officers nor did he feel uncomfortable about their entry into his house"); *Commonwealth* v. *Walker*, 370 Mass. 548, 555-556 (1970) (voluntary consent found in "atmosphere of tension and fear" where "only element of fear was injected by the defendant's conduct" and "[occupant] was frightened — not of the police, but of the defendant [in the house] and what he might do to avoid arrest"); *United States* v. *Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (decision to open door voluntary where officer first called out to occupants and then requested to speak with them about drugs in garage, and "did not use [an] imperative . . . [but] phrased his words in the form of a request [so that the occupants] were free to deny that request or alternatively talk to the agent through the closed door"); *Robbins* v. *MacKenzie, supra.* The multiple ambiguities in the officer's question and Rose's response only compound the deficiency of the Commonwealth's assertion that Rose voluntarily consented to the entry.

The Commonwealth points to several cases where courts have found voluntary consent in support of its argument that such consent existed here. Under a totality of the circumstances analysis, such as that employed to determine the voluntariness of consent, each case necessarily turns on its facts. See *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 233 (1973) (ascertaining whether consent is voluntary involves "careful sifting of the unique facts and circumstances of each case"). It is not surprising, then, that courts, including this one, have found voluntary consent in some cases in spite of the existence of some coercive factors absent in the instant case. However, of the relevant cases cited by the Commonwealth, all are distinguishable from the case before us in that they contain significant indicia of voluntariness not present here. Moreover, the officer-occupant exchanges that preceded entry in many of these cases lack the ambiguity that is fatal to the Commonwealth's claim of consent in this matter. In *United States* v. *Walls*, 225 F.3d 858, 862 (7th

Cir. 2000), for instance, the occupants initially refused entry to the agents who first knocked at the door. The occupants, who were "neither intimidated by the agents' presence nor ignorant of the right to refuse entrance," first shouted at the agents that they could not enter and that they needed a warrant. *Id.* Only after the agents identified themselves and told the occupants that they were conducting an investigation about two packages that had been delivered did the defendant open the door, step back to allow entry, and then motion to the agents for them to follow her into the kitchen. *Id.* See *United States* v. *Griffin*, 530 F.2d 739, 741, 743 (7th Cir. 1976) (finding voluntary consent where, in response to second request to enter, occupant "stepped back, leaving the door open, and led the officers into the apartment"; officers first explained basis for wanting to enter, defendant responded "no" to first request and shut door in their faces, indicating awareness of right to refuse entry and lack of intimidation by officers' authority); *Davis* v. *United States*, 327 F.2d 301, 302 (9th Cir. 1964) (officer in plain clothes knocked on defendant's door at noontime, said, "I would like to talk to Albert Davis," and in response, young girl said, "Come in"); *United States* v. *Ramirez-Chilel*, 289 F.3d 744, 746-747 (11th Cir. 2002) (police stated purpose and requested entry); *People* v. *Lozano*, 316 Ill. App. 3d 505, 510-511 (2000) (police sergeant had asked "if they could come in to find out what had happened" and that defendant, who was himself a police officer, voluntarily consented by opening door and stepping aside); *State* v. *Tomlinson*, 254 Wis. 2d 502, 517, 524 (2002) (consent to enter found where occupant opened door and walked into house in response to officer's request for permission to enter house; occupant did not claim coercion or duress).

The Commonwealth also relies on *Commonwealth* v. *Voisine*, 414 Mass. 772 (1993), for the proposition that Rose's act of pointing to the kitchen was sufficiently consensual. There, however, the woman (who was the apartment lessee) testified at the hearing on the motion to suppress that she was aware of her right not to admit the police, but nonetheless chose voluntarily to let the police enter. *Id.* at 783. The court relied heavily on that testimony in finding voluntary consent. *Id.* Here, Rose did not testify; she made no concession as to the voluntariness of

any consent; and there is insufficient evidence on the record before us to establish it. The Commonwealth also points to the case of *Commonwealth* v. *Hill*, 57 Mass. App. Ct. 240, 244 (2003), for support that where an occupant "freely step[s] aside," such an action manifests consent. However, there were additional indicia of voluntariness not present in the instant case. The defendant in the *Hill* case, who answered the door only after, and in response to, the officers' second visit, "knew who [the officers] were, asked them what they wanted, and freely stepped aside allowing them to enter the apartment." *Id.*

The dissent attempts to justify the police entry in this case on a variety of theories, some of which even the Commonwealth has not asserted. According to the dissent, "[i]f the conduct viewed objectively is reasonable, the police have violated no right, constitutional or otherwise." *Post* at 247. While both the United States and Massachusetts Constitutions require that police conduct be "reasonable," more is required than merely a label. The reasonableness of a warrantless entry based on consent is measured according to more specific criteria; the prosecution must show that the consent was truly voluntary, "unfettered by coercion, express or implied." *Commonwealth* v. *Voisine, supra* at 783, quoting *Commonwealth* v. *Walker, supra* at 555. Only if voluntary consent is in fact given can we say that the police were "reasonable" in entering the home. Absent voluntary consent, we do not rely on our own notions of "reasonableness" to justify the entry. Recognizing the well-established doctrine of voluntary consent, the Commonwealth has not sought to establish lawful entry on a showing that the officers' conduct was somehow independently "reasonable," and we will not depart from our case law to do so.

In a similar vein, the dissent suggests that the entry here might be justified on the basis of exigent circumstances. The dissent infers that the crime was "evanescent" and would " 'go by the boards,' if not immediately responded to" and that "the police would have been derelict in their duty to leave Dysili's report unattended to while they fretted over the need to get a warrant or to do something else to gain 'official' entry to the defendant's apartment." *Post* at 248. Again, the Commonwealth

does not rely on a claim of probable cause and exigent circumstances. Had the Commonwealth believed probable cause and exigent circumstances justified entry, surely it would have so argued. Instead, the Commonwealth seeks to justify the police entry into the defendant's home on one basis only — Rose's alleged voluntary consent. Having relied exclusively on a theory of consent, consent must be established. In requiring that the Commonwealth prove that consent, we are in no way suggesting that the police should not have "responded to" Dysili's report that she had just been attacked or that they should have left Dysili's report "unattended to." *Post* at 248. We merely insist — as we always do — that the police response remain within constitutional bounds.

In addressing the ultimate question presented, "whether Rose actually consented to the entry," *post* at 249, the dissent in effect shifts the burden with respect to the voluntariness of consent from the Commonwealth to the defendant. Tellingly, Justice Greaney writes, "[h]ad the defendant adequately raised this theory of suppression [i.e., voluntariness] at the hearing, the judge undoubtedly would have provided more detailed findings regarding the issue of voluntariness." *Post* at 250. Yet it is not incumbent on the defendant to refute all possible theories that might justify legal entry into the home. On the contrary, it is the Commonwealth's obligation to establish its theory of entry and prove lawful entry based on that theory. See *Commonwealth* v. *Walker, supra* at 554-555, citing *Bumper* v. *North Carolina,* 391 U.S. 543, 548 (1968). See also *Commonwealth* v. *Sanna,* 424 Mass. 92, 97-98 (1997); *Commonwealth* v. *Aguiar,* 370 Mass. 490, 496 (1976). The Commonwealth bears this burden regardless whether the defendant has, or is planning, to challenge any aspect of that theory.

The dissent also focuses on the fact that the officers "did not try to conceal . . . their identity or their purpose," "used no trickery" and did not "attempt to frighten or intimidate" the occupants. *Post* at 250-251. The key issue here is not whether the officers intended to coerce Rose into assenting to entry, but whether, due to the circumstances surrounding entry, Rose was intimidated to the extent that her alleged consent was not voluntary. Similarly, that the officers may not have engaged in

blatant intimidation is not, by itself, sufficient proof that an occupant's consent is voluntary. "Subtle coercion, in the form of an assertion of authority or color of office by the law enforcement officers may make what appears to be a voluntary act an involuntary one." *United States* v. *Griffin,* 530 F.2d 739, 742 (7th Cir. 1976). In analyzing the totality of the circumstances, courts have found a lack of voluntary consent even in the absence of overt intimidation by the police. See, e.g., *United States* v. *Shaibu,* 920 F.2d 1423, 1427 (9th Cir. 1990); *Holmes* v. *State,* 347 Ark. 530, 540 (2002). Similarly, that Rose "did not object, turn away, or call the defendant to the door," *post* at 250, on this record, is equally inadequate to establish voluntary consent. See *United States* v. *Shaibu, supra,* quoting *Johnson* v. *United States,* 333 U.S. 10, 17 (1948) ("The government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry. 'This will not do' "). See also *Holmes* v. *State, supra* at 539.

Finally, the dissent suggests that our holding today amounts to a "heightened constitutional standard," *post* at 254, that would require the officers in this case to have either obtained a warrant or "explicit[ly] warn[ed] [the occupant] of the right to refuse consent." *Ibid.* We would require neither. As illustrated by the cases discussed above, there are various means, short of explicit advice to the occupant about her right to refuse consent, that would take no more time and employ no more resources than the approach taken by the officers in this case, by which the police may make clear that they are merely requesting permission to enter, not demanding entry. See, e.g., *United States* v. *Walls,* 225 F.3d 858, 862 (7th Cir. 2000); *United States* v. *Tobin,* 923 F.2d 1506, 1529 (11th Cir. 1991); *United States* v. *Griffin, supra*; *People* v. *Lozano,* 316 Ill. App. 3d 505, 510 (2000); *State* v. *Tomlinson,* 254 Wis. 2d 502, 524 (2002). Instead, we affirm today what we have long held: where, as here, the police choose not to obtain a warrant, and probable cause and exigent circumstances are absent, the Commonwealth must establish voluntary consent. Such consent must be shown to be more than mere conjecture and its voluntariness something

other than capitulation to official authority. See discussion, *supra*. We do not change our law today; we simply apply existing law to the facts of the case. While society does indeed have a "substantial interest in the continuation of consent entries," *post* at 255, so too do we have an interest in protecting the home from entries obtained through coercive means in violation of the Constitution. Because we cannot discern that voluntary consent was given in the circumstances of this case, the Commonwealth has not carried its burden under the Fourth Amendment and art. 14. Therefore, we do not reach the question whether Rose had authority to permit the entry into the defendant's home or whether the police reasonably believed that she did.

3. *Conclusion.* The order allowing the motion to suppress the drugs seized during the search of the defendant's apartment is affirmed.

*So ordered.*

GREANEY, J. (dissenting). The touchstone of any case like this is the reasonableness of the police conduct. If the conduct viewed objectively is reasonable, the police have violated no right, constitutional or otherwise. See *Commonwealth* v. *Sanna*, 424 Mass. 92, 98 (1997); *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 178 (1980). The conduct of the Springfield police here was eminently reasonable, and the court, in failing to recognize it as such, has strayed from acceptable norms.

Officer Ellsworth was called on to investigate a crime reported at 4:40 A.M. by a woman (Lucy Dysili) who, in great distress, informed him that she had gone to "Danny's apartment in order to buy crack cocaine" and that "Danny" and "Rose" had assaulted her there. Officer Ellsworth knew that (a) "Danny" was the defendant; (b) "Rose" was a woman he previously had seen in the defendant's company and at the defendant's apartment; (c) the reported assault had occurred in the defendant's apartment only two and one-half blocks from

where he and Dysili then stood; and (d) he (Officer Ellsworth) had been to the defendant's apartment at least ten times in the past year in response to complaints about drugs, fights, and prostitution. He could reasonably infer from Dysili's statements that "Rose" and the defendant were actually in the apartment at that time selling cocaine. In these circumstances, the police would have been derelict in their duty to leave Dysili's report unattended to while they fretted over the need to get a warrant or to do something else to gain "official" entry into the defendant's apartment. Crimes, such as occurred here, tend to be evanescent and they will "go by the boards," if not immediately responded to.[1]

Officer Ellsworth, now accompanied by two other uniformed officers, knocked on the defendant's door, and it was opened by a woman he recognized as "Rose." Rose responded to his inquiry as to the defendant's whereabouts ("Where's Danny?") by stepping back from the doorway and pointing toward the rear of the apartment.[2] Two other unidentified individuals who were present in the living room also pointed in the same direction. Officer Ellsworth and one other officer proceeded, as directed by Rose, to the kitchen. There, they found the defendant seated at a table on which lay, in plain view, a large pile of crack cocaine and some heroin. Marijuana lay on a nearby shelf, also in plain view.

The court wisely stays away from the issue of authority. Officer Ellsworth knew that Rose was not just a casual guest of the defendant. He testified at the motion hearing that he had seen the defendant and Rose together and had seen her "coming to and from" the defendant's apartment. Officer Ellsworth had every reason to believe that Rose was aiding the defendant in selling cocaine from that apartment. One cannot think of a more direct connection to the premises. Moreover, the defendant

[1]This proposition is not an effort, as the court suggests, to demonstrate that the police entry was justified by probable cause and exigent circumstances. The factually compelling circumstances underscore the reasonableness of the police officers' immediate response, which led (as next discussed) to Rose's lawfully allowing them into the defendant's apartment.

[2]Officer Ellsworth testified that Rose "took a step back" from the doorway as she pointed to the kitchen. Although the judge made no findings regarding this testimony, the defendant, in his brief, concedes its accuracy.

concedes that no search was involved and that the challenged consent to enter was limited to the kitchen, an area where visitors normally would be received. In such circumstances, "[t]here is sound authority that, at least when the [individual who consents] is more than a casual visitor and 'had the run of the house,' [her] lesser interest in the premises is sufficient to render that limited consent effective." 4 W.R. LaFave, Search and Seizure § 8.5(e), at 235 & n.117 (4th ed. 2004), citing *United States* v. *Turbyfill*, 525 F.2d 57 (8th Cir. 1975); *Nix* v. *State*, 621 P.2d 1347 (Alaska 1981); *People* v. *Shaffer*, 111 Ill. App. 3d 1054 (1982); *State* v. *Thompson*, 578 N.W.2d 734 (Minn. 1998).

Officer Ellsworth's entry also was justified by the doctrine of apparent authority, under which consent is judged against an objective standard: "[W]ould the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises?" *Illinois* v. *Rodriguez*, 497 U.S. 177, 188 (1990), quoting *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968). See *Commonwealth* v. *Ortiz*, 422 Mass. 64, 70 (1996); *Commonwealth* v. *Wahlstrom*, 375 Mass. 115, 118 (1978). It was reasonable for Officer Ellsworth, who had called on the defendant at his apartment several times in the past and once had been let into the apartment by a woman, to assume that Rose was part of the defendant's operation and could authorize him to enter the apartment to speak with the defendant. Rose, after all, took it upon herself to answer the defendant's door at approximately 5 A.M. By all accounts, her response to his question as to the defendant's whereabouts was spontaneous and immediate, and she gave no outward indication that she was uncertain as to whether she should, or should not, admit the officers. The question then becomes whether Rose actually consented to the entry.

Consent as the basis for a warrantless entry must be "unfettered by coercion, express or implied, and also something more than mere 'acquiescence to a claim of lawful authority.' " *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). Whether a particular consent was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Commonwealth* v. *Gaynor*, 443 Mass. 245,

253 (2005), quoting *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 227 (1973). The judge made an implicit finding in this case that the Commonwealth's evidence demonstrated, by a preponderance of the evidence, see *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496 (1976), that Rose's consent was voluntarily and freely given. Had the defendant adequately raised this theory of suppression at the hearing, the judge undoubtedly would have provided more detailed findings regarding the issue of voluntariness.[3] As it is, however, there is ample evidence in the record to permit a determination that the Commonwealth has met its burden on this point.

The officers were in uniform and did not try to conceal from Rose, or the others in the apartment, their identity or their purpose. See *Commonwealth* v. *Burgess*, 434 Mass. 307, 310 (2001). When Officer Ellsworth asked Rose where he could find the defendant, she did not object, turn away, or call the defendant to the door. She (as well as two other individuals) instead pointed toward the kitchen and stepped back, thereby communicating to Officer Ellsworth that he should enter and proceed in the direction in which she pointed. Although permission to enter was demonstrated by a gesture rather than verbal invitation, it was, in these circumstances, neither ambiguously or equivocally conveyed. See *Commonwealth* v. *Voisine, supra* at 783 (consent to enter valid when communicated by pointing in direction of bedroom); *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 177 & n.3 (1980) (explicit gesture of opening jacket indicated consent to search). See also *United States* v. *Walls*, 225 F.3d 858, 862 (7th Cir. 2000) ("It is well established that consent may be manifested in a non-verbal as well as a verbal manner . . . and [the defendant's] action in opening the door and stepping back to allow the entry was sufficient to convey

[3] "There is no reason for the Commonwealth to extend unnecessarily the length of the suppression hearing by presenting evidence on issues not raised by the defense. When a defendant attempts to raise a new issue after the completion of the hearing's evidentiary phase, the evidence on that issue is likely to be 'scant' or nonexistent." *Commonwealth* v. *Silva*, 440 Mass. 772, 781 (2004). This is one primary reason that the grounds on which a suppression motion is based must be stated with particularity in the motion and accompanying affidavit or, otherwise, be deemed waived. See Mass. R. Crim. P. 13 (a) (2), 378 Mass. 871 (1979).

her consent in these circumstances"). Moreover, it may be inferred (from the absence of any findings to the contrary) that as Officer Ellsworth stepped into the apartment and proceeded toward the kitchen, neither Rose, nor any of the other individuals who were present in the living room, gave any sign that he should not enter or otherwise moved to stop him. See *Commonwealth* v. *Maloney*, 399 Mass. 785, 787 (1987).

This is not a case where consent to enter is merely "an acquiescence to a claim of lawful authority." Officer Ellsworth specifically asked where he could find the defendant, thus expressly conveying to Rose his wish to speak with the defendant. Rose, in response, did not merely turn away from the open door, but pointed toward the defendant and stepped back to allow the officer to enter the apartment. Contrast *United States* v. *Shaibu*, 920 F. 2d 1423 (9th Cir. 1990) (finding ambiguity when occupant, who had met officers in hallway, turned away and walked back into apartment). Rose, quite obviously, was aware that the police visit to the apartment at 5 A.M. was not a social call. The officers used no trickery or otherwise attempted to dissuade her from resisting entry. Nor did they attempt to frighten or intimidate. Contrast *Commonwealth* v. *Harmond*, 376 Mass. 557, 558, 562 (1978) (consent involuntary when defendant handcuffed and guarded by one or more police officers anxious to locate weapon); *United States* v. *Edmondson*, 791 F.2d 1512, 1514 (11th Cir. 1986) (finding coercion when Federal agents yelled, "F.B.I. Open the door"). No weapons were drawn. The court's professed inability to infer consent in this case is an expression of judicial surrealism.

The principle that police may not make a warrantless entry into a suspect's home in the absence of exigent circumstances or consent is firmly rooted in Fourth Amendment jurisprudence and strictly adhered to in all of our cases. See *Commonwealth* v. *Sanna*, *supra* at 96-97 & n.9. This case is emphatically not about whether police entry into the home may be deemed consensual, despite the presence of express or implied official coercion or the absence of any outward manifestation of consent. My point of difference with the court concerns whether the evidence in the record, examined as a whole, supports the judge's implicit determination that consent was given by Rose

freely and voluntarily. Some of the very cases highlighted by
the court to demonstrate that Rose's consent was not "suf-
ficiently voluntary to comply with the requirements for a war-
rantless search," *ante* at 241-243, when examined on their facts,
contain indicia of coercion far more blatant than the subtle pos-
sibilities discerned by the court in this case. The cases, therefore,
are a weak platform to support the arching conclusions the
court attempts to draw from them, and they point forcefully to
justify the lawfulness of what occurred here. In *Commonwealth*
v. *Sanna, supra*, for example, we concluded that a father's
invitation to police officers to enter his home to speak with his
son was not coerced, even though (1) the officers lied about the
true purpose of their visit (to arrest the son), (2) the officers had
parked their unmarked cruiser behind the father's automobile,
thus physically preventing him from driving away, and (3) a
number of additional officers (presumably armed) were stationed
in areas surrounding the house, ready to effectuate the arrest.
See *id.* at 94 n.1, 97-98 & n.10. And, in *Commonwealth* v.
*Voisine, supra* at 776, a woman opened her apartment door to
find five or six police officers, all with weapons drawn. In spite
of undisputed evidence of what can only be deemed an
intimidating show of force (certainly sufficient, according to the
court's reasoning, to overcome any subsequent consent to enter),
we concluded that the woman's hand gesture, silently pointing
in the direction of the bedroom where the defendant was hiding,
indicated her voluntary consent to the officers' entry.

The facts of *Commonwealth* v. *Walker, supra*, present an
even more dramatic contrast to the facts of this case. There, a
"contingent" of police officers sought entry into the apartment
of the defendant's fiancée. The officers surrounded the ground-
floor apartment, knocked loudly on the door, and demanded
entry. The officers attempted to enter the apartment door using
a passkey, but "it was not until a bolt on the inside of the apart-
ment door was released by [the defendant's fiancée] that the
police actually found themselves inside." *Id.* at 552. The court
recognized that the situation was fraught with tension and fear
("There was talk of guns by the defendant [and a] shootout
seemed imminently possible," *id.* at 555), but attributed the fear
entirely to the defendant's conduct, which was "unknown to the

police at the time they sought entry into the apartment." *Id.* at 556. In reaching its conclusion that the judge was warranted in determining that consent to the officers' entry was freely and voluntarily given, the *Walker* court attached no importance to, indeed did not even address, the officers' failure to request permission before entering the apartment. Read in tandem with today's opinion, the *Walker* court's silence on this matter, heretofore unremarkable, appears to be a rather glaring omission. See *Commonwealth* v. *Buchanan*, 384 Mass. 103, 107 (1981) (gesture of opening door was "election of free choice" by individual who had sufficient experience to know she could insist on warrant, despite being informed by police officers that they "would remain outside the door and that she might be charged if they found [the suspect] inside the apartment"); *United States* v. *Ramirez-Chilel*, 289 F.3d 744, 751-752 (11th Cir. 2002), cert. denied, 537 U.S. 1114 (2003) (at midnight, four law enforcement officers, identifying themselves in Spanish, knocked on door of trailer where suspect lived with girl friend and two small children, and, after suspect "yielded the right-of-way," entered home; entry was consensual because "no official show of force which would have 'forced' the defendant to let the officers in"). Cf. *Commonwealth* v. *Kipp*, 57 Mass. App. Ct. 629, 631-632 (2003) (apartment search consensual, despite defendant, who was in custody, being told that police "would apply for a search warrant [and] if they searched pursuant to a warrant, they would damage the apartment; if, however, the defendant consented to a search, the police would show a little courtesy and not be destructive; and, if drugs were found on the premises, the defendant's wife would also be arrested").[4]

The court departs from established principles when it speculates that Rose might have misinterpreted Officer Ellsworth's question "as an expression of the officers' intention

---

[4]The facts of this case bear no similarity to those in another case cited by the court, *Bumper* v. *North Carolina*, 391 U.S. 543, 549-550 (1968), in which four white law enforcement officers falsely asserted to a suspect's African-American grandmother that they had a warrant to search her home. There can be no disagreement with the conclusion of the United States Supreme Court that the elderly woman's response, "Go ahead," in obedience to the officers, was not, in fact, freely and voluntarily given. See *id.*

to enter the defendant's home, regardless of [her] response" and that Rose "probably did not know at the time she pointed whether the officers merely intended to question [the defendant], or whether they came to arrest him or search the home." The court implicitly articulates, for the first time today, a heightened constitutional standard to evaluate the validity of a consensual warrantless entry. To succeed under the court's test, the Commonwealth must demonstrate, with affirmative evidence, both that the police request to enter was not misunderstood as a demand to enter and that the presence of police (regardless of the officer's objectively manifested intentions) could not have been misconstrued as an assertion of official authority. Such evidence ordinarily will not be forthcoming in the absence of an explicit warning of the right to refuse consent, a warning we have repeatedly stated is not necessary. See *Commonwealth v. Voisine, supra* at 783; *Commonwealth v. Buchanan, supra* at 106-107; *Commonwealth v. Harmond*, 376 Mass. 557, 561 (1978), quoting *Commonwealth v. Walker, supra* at 555; *Commonwealth v. Aguiar*, 370 Mass. 490, 497 (1976).

The question what standard of proof is required, under the Fourth and Fourteenth Amendments to the United States Constitution, to demonstrate that a consent to search was voluntarily given, was considered by the United States Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The Court concluded that a heightened burden of proof, such as the one necessary to prove a " 'knowing and intelligent' waiver" (see *Johnson v. Zerbst*, 304 U.S. 458, 464 [1938]), is neither required nor appropriate and held that the traditional test of voluntariness used for police questioning suffices. See *Schneckloth v. Bustamonte, supra* at 248-249. The Court suggested that requiring the prosecution to meet a higher standard "would, in practice, create serious doubt whether consent searches could continue to be conducted." *Id.* at 229. As a practical matter, the Court reasoned, "[i]t would be unrealistic to expect that in the informal, unstructured context of a consent search, a policeman, upon pain of tainting the evidence obtained, could make the detailed type of examination demanded [to prove a 'knowing

and intelligent' waiver]." *Id.* at 245.[5] Society has a substantial interest in the continuation of consent entries, and our reaffirmation of the authority of police officers to enter a home without a warrant, when someone with authority to do so consents to the entry, in circumstances, as here, that are untainted by evidence of police coercion or other abuse of authority, would not in any way undermine society's (and our) interest in the sanctity of the home.

Rose, admittedly, did not know the identify and purpose of the callers before she opened the door. Her actions once she became aware that the police at the door were intent on speaking with the defendant, however, were constitutionally as

---

[5]As stated above, the issue before the United States Supreme Court in *Schneckloth* v. *Bustamonte*, 412 U.S. 218 (1973), was "what must the prosecution prove to demonstrate that a consent was 'voluntarily' given." *Id.* at 223. The Court reasoned that the standard for effective consent for police searches, as with police questioning, must be sufficiently flexible to accommodate two competing concerns: "the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." *Id.* at 227. In ultimately rejecting the strict standard of voluntariness applied to the waiver of rights guaranteed a criminal defendant at trial, the *Bustamonte* Court stated, "The protections of the Fourth Amendment are of a wholly different order, and have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial." *Id.* at 242. The Court further stated:

> "Nor can it even be said that a search, as opposed to an eventual trial, is somehow 'unfair' if a person consents to a search. While the Fourth and Fourteenth Amendments limit the circumstances under which the police can conduct a search, there is nothing constitutionally suspect in a person's voluntarily allowing a search. The actual conduct of the search may be precisely the same as if the police had obtained a warrant. And, unlike those constitutional guarantees that protect a defendant at trial, it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment."

*Id.* at 242-243.

This court's repeated citations to language in the *Bustamonte* decision are curious, given the generally recognized import of the Supreme Court's holding. See 4 W.R. LaFave, Search and Seizure § 8.2, at 51 (4th ed. 2004) ("there is reason to be concerned about the [*Bustamonte*] holding"). According to Professor LaFave, commentators have severely criticized the *Bustamonte* standard of voluntariness as "ineffective," "unworkable," and "unpredictable." See *id.* at 51-55 & nn. 7-9, quoting Weinreb, Generalities of the Fourth Amendment, 42 U. Chi. L. Rev. 47, 57 (1974); Stuntz, Privacy's Problem and the Law of Criminal Procedure, 93 Mich. L. Rev. 1016, 1064 (1995); Strauss, Reconstructing Consent, 92 J. Crim. L. & Criminology 211, 212 (2001).

adequate a consent as if she had verbally invited them to come inside. See *Commonwealth* v. *Voisine, supra* at 783; *United States* v. *Ramirez-Chilel, supra* at 752 (body language demonstrated "implied consent to enter"); *Robbins* v. *MacKenzie*, 364 F.2d 45, 48 (1st Cir.), cert. denied, 385 U.S. 913 (1966). Officer Ellsworth asked Rose where he could find the defendant. There was no need to take the time specifically to ask permission to enter or to explain to Rose her right to refuse his entry. See *Commonwealth* v. *Voisine, supra*; *Commonwealth* v. *Harmond, supra*; *Commonwealth* v. *Aguiar, supra*. The visit did not take place in the middle of the night, and no one was roused from bed. Moreover, the officers went to the defendant's apartment in immediate response to Dysilli's report of a violent crime that had, allegedly, just been committed by the defendant and Rose. Rose and the others undoubtedly knew that "the jig was up," but even this knowledge does not automatically preclude a finding of voluntary consent. See *Commonwealth* v. *Harmond, supra* at 562, citing *United States* v. *Ciovacco*, 518 F.2d 29, 31 (1st Cir. 1975). After all, the police were not seeking entry to high tea at the Ritz. They were there to deal with serious crimes that had just been reported, and in Rose and the defendant, they were dealing with two veterans of police encounters.

The court rejects the compelling facts, choosing instead to construe the facts to create a false ambiguity, then to analyze what occurred hypertechnically to arrive at a conclusion that defies common sense.[6] There was nothing untoward or inap-

---

[6] The court's rejection of my initial premise that "[t]he touchstone of any case like this is the reasonableness of the police conduct" is difficult to comprehend. The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures. Because the police acted reasonably under the circumstances, their conduct did not offend either the Fourth Amendment or art. 14. See *Scott* v. *United States*, 436 U.S. 128, 138 (1978); *Commonwealth* v. *Catanzaro*, 441 Mass. 46, 58 (2004); *Commonwealth* v. *Santana*, 420 Mass. 205, 208 (1995); *Commonwealth* v. *Phillips*, 413 Mass. 50, 54-55 (1992). See also 4 W.R. LaFave, *supra* at § 8.1(b), at 18-19 (addressing concept that Fourth Amendment is concerned with discouraging unreasonable activity on part of police officers and, thus, is not violated when search is conducted with reasonable belief that voluntary consent has been granted). The United States Supreme Court has stated the same concept, in connection with the doctrine of apparent authority to consent: "[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that

propriate about the officer's entry into the apartment and subsequent presence in the kitchen where, the defendant concedes, cocaine, marijuana, and heroin lay in plain sight. Stationing an officer outside the door, while attempting at 5 A.M. in the morning to obtain a warrant, would have been an unnecessary drain on the already meager resources of the Springfield police. The evidence was lawfully seized without a warrant, and the defendant's motion to suppress should have been denied. I, therefore, dissent.

---

must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." *Illinois* v. *Rodriguez*, 497 U.S. 177, 185 (1990).