## COMMONWEALTH *vs.* JANICE ROBINSON.

Suffolk.   October 9, 1986. — February 12, 1987.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* State action,
Hospital, Consent.

In the case of a mother indicted in the death of her infant who, while hospi-
talized for "failure to thrive," suddenly became critically ill and died,
the defendant's motion to suppress from evidence two nursing bottles
("nursers") used in feeding the infant, together with the results of chem-
ical tests showing the nursers' contents to be tainted with dangerous
concentrations of sodium chloride, was correctly denied even though
the judge at the motion hearing improperly precluded the defendant from
presenting fully the issue whether the government had participated in,
directed, or encouraged the acquisition of the nursers, where, even
assuming the presence of State action during the initial phases of inves-
tigation by hospital personnel, the record amply supported the judge's
findings that the defendant voluntarily consented to giving the nursers
to the hospital's general counsel and, at a later time, after receiving
Miranda warnings and when represented by counsel, assented to an
assistant district attorney's request to keep the nursers. [216-218]

INDICTMENT found and returned in the Superior Court De-
partment on May 23, 1984.

A pretrial motion to suppress evidence was heard by *Sandra
L. Hamlin,* J.

An application for an interlocutory appeal was allowed by
*Liacos,* J., in the Supreme Judicial Court for the county of
Suffolk and the appeal was reported by him to the full court.

*Daniel J. O'Connell, III (Constance M. Sweeney & Lisa C.
deSousa* with him) for the defendant.

*John A. Kiernan,* Assistant District Attorney (*Robert N.
Tochka,* Assistant District Attorney, with him) for the Com-
monwealth.

LIACOS, J. The defendant was indicted in Suffolk County on May 23, 1984, for manslaughter in connection with the death of her eleven month old son. While hospitalized at Children's Hospital in Boston for "failure to thrive," the child suddenly became critically ill on March 3, 1984. Tests revealed a dangerously high level of sodium chloride (sodium) in the child's blood and in his formula. Dr. David Perlmutter, the staff physician in charge of his care, went to the child's room looking for "anything . . . that might explain the baby's condition." Finding a partially filled "plastic playtex nurser baby bottle" (nurser no. 1) in a cloth zippered bag among the defendant's belongings, he had a sample of the formula in the nurser tested. The sample contained a very high concentration of sodium.

The defendant moved in March, 1985, to suppress nurser no. 1 which Dr. Perlmutter had discovered, an empty nurser (nurser no. 2) which the defendant subsequently turned over to the hospital's general counsel, and test results derived from chemical analysis of the two nursers and their contents. She has maintained that the evidence was obtained pursuant to an unlawful warrantless search and seizure.

After hearing evidence for thirteen days between September 19, 1985, and January 16, 1986, the motion judge denied the motion to suppress on April 10, 1986.[1] Pursuant to Mass. R. Crim. P. 15 (b) (2), 378 Mass. 882 (1979), the defendant filed an application to this court seeking leave to appeal the denial of her motion. A single justice of this court granted the application and transferred the case to the full court on April 30, 1986.[2] We hold that there was no error.

---

[1] There is no explanation in the record to indicate the reasons for the length of time between the conclusion of the hearings on January 16, 1986, and the date of the judge's written findings and rulings.

[2] Pursuant to G. L. c. 211, § 3 (1984 ed.), the complaint presented to the single justice also sought leave to appeal from the motion judge's denial of a motion to exclude other evidence. The matter subsequently was bifurcated for hearing before the full court. The interlocutory appeal on the motion to exclude was decided in *Robinson* v. *Commonwealth, ante* 131 (1987).

The forty-five page findings of the motion judge can be summarized as follows. The defendant's child entered Children's Hospital on February 27, 1984. The defendant, who had been sleeping in her child's room,[3] observed, in the early morning of March 3, 1984, that he was very puffy and was having difficulty breathing. She reported this to a nurse's aide. The child's blood was tested. A dangerously high level of sodium was discovered.

Dr. Perlmutter was informed and sought to discover the source of the sodium. He tasted, then had tested, a sample of the hospital formula which was designated for the child and kept in a quart bottle in the ward kitchen refrigerator.[4] The test showed excessive sodium in the formula. Dr. Perlmutter then went to the child's room "to search for further diagnostic and medical clues as to the source of the sodium and to determine whether other children at the hospital were at risk." Inside the cloth zippered bag, among the defendant's belongings, he found nurser no. 1, which was used to feed the child.[5] The physician took some of its contents, returned the nurser to the bag, and then had the hospital's chemist test the sample.[6] Test results showing a high concentration of sodium were reported at approximately 2 P.M.

At the hospital's request, Lawrence Curran, vice president and general counsel of the private investigatory agency which provides the hospital's security services, came to the hospital at approximately 6 P.M. on March 3, 1984. Responding to Mr.

[3] It was the practice at Children's Hospital to allow parents to sleep in their children's rooms. The defendant's personal belongings were in the room which her child shared with three other children. Included in those belongings was the cloth bag in which Dr. Perlmutter found nurser no. 1.

[4] The defendant does not contest the validity of Dr. Perlmutter's action in taking the quart bottle from the refrigerator, or in asking for a sodium analysis of its contents.

[5] During prior hospitalizations, the child had experienced difficulty using the nursers provided by the hospital. Consequently, the defendant brought the child's preferred nurser to the hospital. All staff members who fed the child freely used the nurser.

[6] The defendant had not given permission for Dr. Perlmutter's actions, nor did she have knowledge of such actions at the time.

Curran's call, Assistant District Attorney John Dawley arrived at 8:25 P.M. Although Mr. Dawley met with Mr. Curran and several hospital administrators, the judge found that "[n]o one asked [Mr. Dawley] to take any action. He did not, at any time or in any way, direct the course of events that evening or thereafter. His position at this time is best described as an observer."

The defendant consented to meet with Mr. Curran and the hospital's general counsel, Ellen Weiss, at 10:15 that evening. She was told that the purpose of the meeting was to gather further information on the child's routine. Mr. Dawley was present. When the defendant arrived, Mr. Curran introduced himself, Ms. Weiss, and Mr. Dawley. He expressed the hospital's concern for her situation and asked whether she would speak to them "as part of a number of efforts being undertaken to figure out what happened." The defendant indicated that she was "very willing to cooperate to determine what had happened." She was asked to relate what had happened during the day with her child. Although present at Mr. Curran's invitation, Mr. Dawley did not participate in any way. He took some notes. He did not ask the defendant any questions or interact in any way with her.

During this interview, the defendant indicated that her child drank the hospital's formula and that she used plastic nursers which she had brought to the hospital. When Mr. Curran asked if the defendant had "any objection to giving the [nurser] to the hospital so [that it] could be secured," she said, "[A]bsolutely none." She indicated that she would be happy to get it.

The judge found that the defendant "voluntarily offered and agreed without any objection at all to give the [nurser] to the hospital." The judge also found that the defendant voluntarily gave Ms. Weiss the two nursers and that she knew by this time that her child's formula had been analyzed. The judge further found that the defendant reasonably expected that the nursers' contents would be analyzed. Mr. Dawley, who was not present when the defendant handed over the nursers, neither directed that they be obtained nor suggested what should be done with them.

The defendant's child died on March 5, 1984. On March 16, 1984, the defendant was interrogated at the Springfield police department.[7] She was represented by counsel and received her Miranda warnings. Assistant District Attorney John Kiernan asked the defendant if she had "any problem with [his] keeping" the nursers. She said she did not. The judge found that her consent was voluntary. The defendant reiterated twice during the interview that "if anyone had asked her on March 3, 1984 for permission to look through her bags or other belongings she would have volunteered to let them do so and would have opened them up and helped anyone or let anyone look at everything."

On March 16, 1984, Terence Law, chemistry supervisor at Children's Hospital, conducted a simulation test at Mr. Kiernan's request to determine how sodium behaves chemically in the kind of formula which the child had received in the hospital. This test did not involve any of the formula prepared for the defendant's child. On March 28, 1984, again at Mr. Kiernan's direction, Law tested samples from the quart bottle and nurser no. 1 for sodium concentration. The test results, confirming that both samples contained tainted formula of a high sodium level, were relayed to the office of the district attorney. On April 30, 1984, Law tested nurser no. 2 and its nipple for sodium. This testing also was done at Mr. Kiernan's request. Some sodium was found. The test results were relayed to the office of the district attorney.

On the basis of the facts summarized above, the judge concluded that the two nursers, as well as the test results of March 16, March 28, and April 30, 1984, would be admissible in evidence. The judge ruled that Dr. Perlmutter's acts on March 3, 1984 — removing the nurser from the defendant's bag, taking a sample of the formula, and returning the nurser to the bag — were "entirely the acts of a private party." Neither directed nor encouraged by any governmental agency, his

---

[7] The judge found that this was the first interrogation of the defendant, although she had been interviewed in connection with her child's condition on three prior occasions.

actions "were done solely for medical and diagnostic reasons and in the furtherance of the hospital's interest in caring for and protecting the [defendant's] baby and its other patients." The judge further ruled that Mr. Curran and Ms. Weiss "were each functioning as a private party when [the defendant] gave the [nursers] to [Ms.] Weiss and not as agents or instrumentalities of the police. No police official instigated or participated in these actions . . . . Therefore, any actions concerning the bottles do not trigger any Fourth Amendment or Article 14 protections, or require the application of the exclusionary rule."

Thus, the judge ruled that " [t]here was no state action involved in the hospital's obtaining of the playtex nurser bottles from [the defendant]," and that the nursers were not subject to suppression. Further, the judge ruled that, even if State action had been involved, the defendant retained no legitimate expectation of privacy in the nursers because she voluntarily gave them to the hospital staff. Consequently, the subsequent transmittal of the nursers by members of the hospital staff to the office of the district attorney did not violate the defendant's right against unreasonable searches and seizures.

As to the tests, the judge found that all three of the challenged tests, conducted at Mr. Kiernan's direction or request, were the result of State action. Nevertheless, the judge found nothing in the record to indicate that the defendant intended to limit her consent so as to exclude chemical testing of the nursers or their contents. The judge concluded that the March 16, 1984, test "was merely a repeat" of the prior private test, and that the defendant had consented, in any event. The judge ruled that the tests conducted on March 28, 1984, were not a significant expansion of the hospital's testing on March 3, 1984, and that, even if they were, they were done with the defendant's consent. Finally, the April 30, 1984, test on the second nurser was found to be admissible because the defendant had consented voluntarily to giving it to members of the hospital staff on March 3, 1984.

The evidence before the motion judge consisted primarily of oral testimony.

"The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw and heard the witnesses, and not of this court. In such a situation, where subsidiary findings of fact have been made by the trial judge, they will be accepted by this court, and we do not substitute our judgment for [hers], absent clear error. *Commonwealth* v. *Murphy*, 362 Mass. 542, 547 (1972). *Commonwealth* v. *Harmond*, 376 Mass. 557, 560-561 (1978)" (and other cases cited).

*Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980). The ultimate legal conclusions to be drawn from the subsidiary findings of fact, however, are matters for review by this court. *Commonwealth* v. *Hosey*, 368 Mass. 571, 574 n.1 (1975). In this case, we find no error requiring reversal of the motion judge's order.

The defendant argues that (1) Mr. Dawley's participation in the decision to obtain the nursers from the defendant and his presence at the interview with the defendant on March 3, 1984, constituted State action; (2) the defendant's consent to the taking of the nursers was not voluntary because she was unaware of the State's participation; (3) the subsequent testing was an impermissible search because it constituted governmental expansion of the hospital's tests of the nursers without the defendant's consent; and (4) the defendant's March 16, 1984, statement that she had "no problem" with the assistant district attorney's "keeping" the nursers did not retroactively authorize the Commonwealth's seizure and testing of the nursers.

Counsel for the defendant has conceded that no State action was involved prior to the arrival of the assistant district attorney at the hospital at 8:25 P.M. on March 3, 1984. The judge ruled correctly that the testing done that afternoon at Dr. Perlmutter's direction is admissible. "Evidence discovered and seized by private parties is admissible without regard to the methods used, unless State officials have instigated or participated in the search." *Commonwealth* v. *Leone*, 386 Mass. 329, 333 (1982). *Commonwealth* v. *Richmond*, 379 Mass. 557, 561-562 (1980). But see *District Attorney for the Plymouth Dist.* v.

*Coffey*, 386 Mass. 218, 226, 229 (1982) (Liacos, J., concurring) (private action does not fall within the exclusionary rule so long as it is limited to private purpose); *Commonwealth* v. *Leone, supra* at 334 (same).

The parties disagree as to whether State action arose on the evening of March 3, 1984, when the assistant district attorney arrived at the hospital. While the judge found that there was no State action involved when the members of the hospital staff subsequently obtained the nursers from the defendant, the defendant takes strong exception to the judge's rulings sustaining the prosecution's objections to questions which she maintains were properly exploring the State action issue. In effect, the defendant maintains that the judge precluded her counsel from eliciting the information necessary to the court's determination whether the government participated in, directed, or encouraged the acquisition of the nursers. We have reviewed the entire transcript and agree that the judge prevented the defendant from developing this theory.[8] The motion judge's refusal to allow counsel to present testimony necessary to resolve complex pretrial issues was error. As the United States Supreme Court has stated, "the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer." *Jackson* v. *Metropolitan Edison Co.*, 419 U.S. 345, 349-350 (1974). "The true nature of the State's involvement may not be immediately obvious, and detailed inquiry may be required in order to determine whether the test [of State action] is met" (citation omitted). *Id.* at 351.

The error of the judge's rulings on this issue is not ground for reversal, however. Even if we assume that there had been State action commencing after Mr. Dawley's arrival in the evening of March 3, 1984, this fact would not affect the result

---

[8] We note, in this context, that the judge allowed counsel for the hospital to participate fully in the suppression hearing. Although no prejudice to the defendant is shown in the circumstances of this case, we frown on the practice of allowing a private party to participate fully in a suppression hearing. The role of private counsel is best limited to advising witnesses whom they represent as to any purported privilege of the witness.

we reach because we conclude that the issue of the defendant's consent was explored fully and that the judge's findings on that issue were not in error. The record amply supports the judge's findings that the defendant consented to giving the nursers to Ms. Weiss on March 3, 1984, and assented, on March 16, 1984, to the assistant district attorney's request to keep the nursers.[9]

"When the Commonwealth relies on consent as the basis for a warrantless search, it must demonstrate 'consent unfettered by coercion, express or implied, . . . [which is] something more than mere "acquiescence to a claim of lawful authority" [citation omitted].' *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). See *Bumper* v. *North Carolina*, 391 U.S. 543, 548-549 (1968); *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974). Voluntariness of consent 'is a question of fact to be determined in the circumstances of each case . . . .' *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496 (1976). The neglect or failure of the police to explain the right of the defendant to refuse to consent to a search is a factor suggesting coercion, but it is not conclusive. *Commonwealth* v. *Walker, supra. Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248-249 (1973). This is true even when a suspect is in custody when asked for permission to search. *Commonwealth* v. *LaBriola*, 370 Mass. 366, 367 (1976); *United States* v. *Watson*, 423 U.S. 411, 424-425 (1976)."

*Commonwealth* v. *Harmond*, 376 Mass. 557, 561 (1978).

The defendant claims that "her consent to give the hospital the [nursers], not knowing of the State's involvement in the

---

[9] The United States Supreme Court stated in *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 227 (1973): "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." See also *Commonwealth* v. *Cantalupo*, 380 Mass. 173, 177 (1980); *Commonwealth* v. *Harmond*, 376 Mass. 557, 561 (1978); *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496 (1976).

decision to obtain such [nursers], was not 'voluntary' as a matter of law." There is conflicting evidence whether the defendant knew that Mr. Dawley was an assistant district attorney when she met with him, Mr. Curran, and Ms. Weiss on the evening of March 3, 1984. "In reviewing the record on this issue, '[w]e accept, as we must, the trial judge's resolution of conflicting testimony . . . .' *Commonwealth* v. *Mahnke,* 368 Mass. 662, 666-667 (1975), cert. denied, 425 U.S. 959 (1976)." *Commonwealth* v. *Cruz,* 373 Mass. 676, 682 n.2 (1977). Furthermore, "[t]he defendant's claim that [her] apparent consent was involuntary should be carefully scrutinized to avoid giving [her] an unfair advantage. See *United States* v. *DiPrima,* 472 F.2d 550, 551 (1st Cir. 1973)." *Commonwealth* v. *Harmond, supra* at 562. The judge found that the defendant acted voluntarily at all times. Whether the defendant knew Mr. Dawley to be an assistant district attorney at the time does not appear material, in light of the defendant's continued, voluntary cooperation with the police as exemplified by her statement on March 16, 1984, at an interrogation where she had received Miranda warnings and was represented by coun- sel.[10] We note also that, even if the defendant had not consented to the tests on March 16, March 28, and April 30, 1984, they were found by the judge on ample evidence to be cumulative of the private, uncontested testing conducted at Dr. Perlmutter's request on March 3, 1984.[11]

The resolution of the defendant's arguments regarding State action and the voluntariness of her consent make it unnecessary

---

[10] As this court stated in *Commonwealth* v. *Aguiar,* 370 Mass. 490, 496 (1976), "[E]ven if a search and seizure is involved here, consent vitiating the need for a search warrant may be found in cooperative conduct. *Commonwealth* v. *Causey,* 356 Mass. 125, 130 (1969)" (and other cases cited).

[11] Compare *United States* v. *Jacobsen,* 466 U.S. 109 (1984) (warrantless governmental chemical tests of contraband privately seized not a violation of the Fourth Amendment), with *State* v. *von Bulow,* 475 A.2d 995 (R.I. 1984) (warrantless governmental testing of items privately seized violates both Fourth Amendment and art. 1, § 6, of Rhode Island Constitution). Neither case involved a consensual surrender by the defendant of the objects tested. The facts in the case at bar make this line of cases inapposite.

to address her two other claims on appeal. The judge's order denying the defendant's motion to suppress is affirmed.

*So ordered.*