## Commonwealth *vs.* Fernando Santos.

Hampden. March 4, 2013. - July 10, 2013.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Rape. Indecent Assault and Battery. Constitutional Law,* Search and seizure. *Search and Seizure,* Consent, Buccal swab. *Practice, Criminal,* Motion to suppress. *Evidence,* Buccal swab, Intoxication, First complaint. *Deoxyribonucleic Acid. Intoxication.*

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence seized during a warrantless search of his apartment, where police officers, in gaining consent from the victim's mother, whom they believed to have actual authority over the premises, were not required to conduct a further inquiry, given that they were not faced with contrary facts tending to suggest that the mother lacked actual authority, and sufficient facts affirmatively known by the police justified their conclusion that the mother had authority to grant entry to the defendant's home [694-697]; further, the judge properly denied the defendant's pretrial motion to suppress the seizure of a cushion cover, where the officers (who were legally present in the home) gained consent for the seizure from the victim's grandmother, who was a person with actual authority [697-698]; finally, the judge properly denied the defendant's pretrial motion to suppress evidence obtained from a buccal swab, where the defendant voluntarily consented to the swab [698].

At the trial of indictments charging rape of a child with force and indecent assault and battery on a child under fourteen, the judge did not abuse her discretion in admitting testimony from the victim's mother despite the victim's grandmother being the "first complaint" witness, where the mother did not testify to what the victim told her concerning what had happened but, rather, described the victim's demeanor while he was talking to her and recounted her actions in telephoning the police, which was relevant to rebut the defense theory that the entire event had been fabricated, as well as to rebut the suggestion that the victim had not seemed upset when he spoke with his grandmother; and where the testimony was also relevant to the contested issue of the victim's state of mind. [699-701]

Indictments found and returned in the Superior Court Department on September 2, 2009.

A pretrial motion to suppress evidence was heard by *Constance M. Sweeney,* J., and the cases were tried before her.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Emily A. Cardy*, Committee for Public Counsel Services (*Nikolas Andreopoulos*, Committee for Public Counsel Services, with her) for the defendant.

*Katherine E. McMahon*, Assistant District Attorney, for the Commonwealth.

*Allison Callahan*, Assistant District Attorney, for District Attorney for the Suffolk District, amicus curiae, submitted a brief.

IRELAND, C.J. A Hampden County jury found the defendant guilty of rape of a child with force, in violation of G. L. c. 265, § 22 (*a*), and indecent assault and battery of a child under fourteen (three indictments), in violation of G. L. c. 265, § 13 (*b*).[1] The defendant timely appealed, and we transferred the case here on our own motion. He argues that a Superior Court judge erred when she denied his motion to suppress evidence obtained from a warrantless search of his apartment, and when she determined that he understood English and was not too incapacitated by alcohol to voluntarily provide a sample of his deoxyribonucleic acid (DNA). He also argues that first complaint testimony admitted at trial impermissibly influenced the jury. Because we conclude that, in the circumstances here, the police possessed sufficient factual information when they determined that a person who appeared to have authority had given consent to enter the defendant's apartment, and because there is no merit to his other claims of error, we affirm the defendant's convictions.

1. *Motion to suppress.* We recite the facts found by the judge at the hearing on the motion to suppress, supplemented by undisputed facts in the record consistent with the judge's findings.[2]

---

[1]The jury found the defendant not guilty of aggravated rape of a child, G. L. c. 265, § 23 (*a*).

[2]At the hearing, four officers and the victim's mother and grandmother testified, and the defendant submitted two affidavits stating, inter alia, that he resided in the first-floor apartment with his girl friend and that he did not grant consent for the police to enter his home. The motion judge implicitly or explicitly credited the testimony, on which we rely for our summary of undisputed facts. See *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007), *S.C.*, 450 Mass. 818 (2008).

See *Commonwealth* v. *Butler*, 423 Mass. 517, 526 n.10 (1996) (we use uncontroverted facts that do not contradict judge's findings).

The victim lived in a second-floor apartment with his mother. His grandmother lived in the first-floor apartment of the same building with her boy friend, the defendant. The residents of the upstairs apartment visited the grandmother "on almost a daily basis," sometimes using a staircase that was inside the first-floor apartment and led to the second floor.

On July 11, 2009, the victim spent the night on a couch in his grandmother's living room. At approximately 2:30 A.M., the defendant returned to this apartment. The grandmother opened the back door of the apartment and noticed the defendant smelled like alcohol and was "walking wobbly a bit." After a brief conversation in Spanish, the defendant's primary language, the grandmother went to bed.

Some time between approximately 2:30 A.M. and 4 A.M., the defendant sexually assaulted the victim on the couch.[3] When the defendant "fell asleep or passed out," the victim went to his grandmother's room, woke her up, and told her what had happened. After talking with the victim for about twenty minutes, the grandmother telephoned the victim's mother, who was in her apartment on the second floor, and asked her to unlock the upstairs door so that the victim could return home. The victim went upstairs and told his mother what had occurred.

The mother telephoned the police from her upstairs apartment, giving them the street address of the home, but not an apartment number. The grandmother knew that the police had been contacted and told the defendant to leave the apartment. Several police officers, who knew they were responding to a 911 telephone call alleging a rape, were dispatched to the address.

On their way to the home, two officers saw the defendant walking down the sidewalk, engaged in a short conversation

---

[3]The victim recounted the following facts at trial: he heard the defendant get a beer from the refrigerator and then saw him next to him on the couch. Over a period of approximately two hours, the defendant orally and digitally raped the victim. Throughout the assault, the victim pretended to be asleep.

with him,[4] asked him to sit in their police cruiser,[5] and then drove the short distance to the victim's home. When the mother saw the police, she went downstairs to the porch. The victim also went downstairs and entered the grandmother's apartment. The mother opened the main door to the building, which led to an entryway with doors for the downstairs and upstairs apartments. The mother led two other officers, who had arrived while the first two officers placed the defendant in the police cruiser, through the open first-floor apartment and into the living room where the victim was apparently waiting. The first officers who arrived at the home noticed that the doors to both apartments were open.

Within minutes after the first two officers were led into the first-floor apartment, other officers arrived and entered the home. In the meantime, the grandmother had moved to the back of her apartment to see her son, who did not live with her, enter the apartment with another police officer.[6] When the grandmother returned to the front of the apartment, she found "the house was full of officers." After speaking with police, the victim was transported by ambulance to a local hospital.

While speaking to the mother and grandmother, the officers learned where the alleged sexual assault had occurred and saw a stain on the couch. Believing the stain to be semen, they wanted to take the cushion cover as evidence. One officer, who came to understand that the grandmother lived in the first-floor apartment, explained "the process [they] were going to go through in collecting evidence" to her, stating, "that if she would allow it [the police] could take the evidence and process it." The

---

[4]The judge noted that the officers had spoken to the defendant in both Spanish and English. One officer testified that he asked the defendant in Spanish who he was and where he was coming from, and another officer testified that he spoke to the defendant in English and the defendant responded in English.

[5]The judge found exigent circumstances justified the defendant being detained: "[T]here was good reason to simply put [the defendant] in the cruiser, and then get on with the next piece of business before doing anything more, because there was, to any reasonable person, an ongoing emergency, public and perhaps medical, occurring at that time, namely an alleged rape on a child that had just happened." The defendant was not restrained or handcuffed.

[6]Our review of the record indicates that the officer who entered through the back door may have been someone other than one of the four officers who testified at the hearing and at trial.

grandmother told them they could take the cover "if [they] need[ed] it."[7]

The defendant was arrested and taken to the police station. No Miranda warnings were given during the booking process. One of the officers who had been at the scene, and who spoke to the defendant in English, requested a buccal swab and provided the defendant with a saliva sample consent form.[8] The officer read the consent form to the defendant in English and told the defendant that "he ha[d] a right to voluntary submission of his DNA swab. We could go forward and attempt to get a warrant for it, and he could deny it, and that it [was] up to him. It [was] voluntary at this time." During this exchange, the officer stated that the defendant spoke to him in English and appeared to understand everything said to him. The defendant signed the consent form, and the officer witnessed it.[9]

At the hearing, the defendant argued, as he does on appeal, that where the officers did not conduct a diligent inquiry whether the mother had authority to grant consent to enter the home, the entry was illegal. Therefore, he asserts, the subsequent seizure of a cushion cover from the apartment was also illegal. He also

---

[7]The cushion cover was taken to the police station and later analyzed. See note 9, *infra.*

[8]The saliva sample consent form, which was admitted in evidence at the hearing on the motion to suppress and at trial, reads as follows:

> "On this date, I, _____, voluntarily provide the Springfield Police Department with a saliva sample. I understand that it is possible that a Judge could issue an order compelling the production of this sample or could deny the motion for an order. However, I waive my right to have a hearing before a judge to object to the production of the sample, and I provide the sample voluntarily, knowingly and intelligently."

The defendant printed his name on the blank line, signed the bottom of the form, and dated it, including the time of 6 A.M.

[9]The results from the swab were compared to the stain on the cover of the couch cushion and were presented at trial. At trial, employees of the State police crime laboratory testified that the deoxyribonucleic acid (DNA) from the "sperm fraction" sample obtained from the couch cushion matched the DNA profile from the defendant. The statistical significance of the match was presented to the jury: the probability of a randomly selected individual having this profile was one in 736.9 quadrillion of the Caucasian population, one in 26.3 quintillion of the African-American population, one in 140.5 quadrillion of the Hispanic population, and one in 1.053 quintillion of the Asian population. See *Commonwealth* v. *Lanigan,* 419 Mass. 15, 20 (1994).

argues that his consent to obtain his DNA was not voluntary because he was intoxicated at the time he signed a consent waiver and because he did not understand English. The motion judge, who was also the trial judge, denied the motion.

When reviewing the denial of a motion to suppress, we accept the motion judge's determinations of the weight and credibility of the testimony, *Commonwealth* v. *Robinson*, 399 Mass. 209, 215 (1987), quoting *Commonwealth* v. *Moon*, 380 Mass. 751, 756 (1980), and accept the judge's findings of fact absent clear error. *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). "The ultimate legal conclusions to be drawn from the subsidiary findings of fact, however, are matters for review by this court." *Commonwealth* v. *Robinson*, *supra*. See *Commonwealth* v. *Silva*, 440 Mass. 772, 775-776 (2004).

a. *Warrantless entry*. The defendant asserts that the warrantless entry by police into his home was not justified because police did not obtain consent from a person with actual or apparent authority. He argues that the judge erred when she found that the police made an understandable and reasonable mistake of fact that the mother could grant entry, and that in accordance with *Commonwealth* v. *Porter P.*, 456 Mass. 254 (2010), the police were required to ask the person leading them into the home if she lived there.

The Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights "expressly provide that every person has the right to be secure against unreasonable searches and seizures in his home." *Commonwealth* v. *Porter P.*, *supra* at 260. See *Commonwealth* v. *Rogers*, 444 Mass. 234, 236 (2005). "[A] warrantless entry into a home constitutes a search in the constitutional sense." *Commonwealth* v. *Lopez*, 458 Mass. 383, 391, 394 (2010). "Given the high value that our Federal and Massachusetts Constitutions assign to the warrant requirement, particularly in relation to a dwelling, we impose a heavy burden on the Commonwealth to justify every warrantless search . . . ." *Commonwealth* v. *Tyree*, 455 Mass. 676, 684 (2010).

However, "[t]he Fourth Amendment's proscription of 'unreasonable searches and seizures' is not violated when a warrantless entry into a home is based on the consent of a third

party who the police, at the time of entry, reasonably, but mistakenly, believed had common authority over the premises." *Commonwealth* v. *Lopez, supra* at 393, discussing *Illinois* v. *Rodriguez*, 497 U.S. 177, 185-186 (1990). Likewise, a defendant's right under art. 14 is not violated "if a warrantless search of a home occurs after a police officer obtains the voluntary consent of a person he reasonably believes, after diligent inquiry, has common authority over the home, but it turns out that the person lacked common authority." *Commonwealth* v. *Porter P., supra* at 271. Diligent inquiry consists of two steps: first, "the police officer must base his conclusion of actual authority on facts, not assumptions or impressions," and second, "even when the consenting individual explicitly asserts that he lives there, if 'the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth,' the police officer must make further inquiry to resolve the ambiguity." *Id.* at 271-272, quoting *Illinois* v. *Rodriguez, supra* at 188.

We take this opportunity to clarify the two-step inquiry required when police enter a home, without a warrant and absent exigent circumstances, after they gain consent from someone they believe to have actual authority over the premises. See *Commonwealth* v. *Porter P., supra* at 271-272. We conclude that, in situations such as the one here, police need not conduct a "further inquiry," the second part of the due diligence analysis, where they possess sufficient facts to form the basis for a reasonable conclusion that a third party has authority to give consent to enter a defendant's home. See *id.* (first part of diligent inquiry is that officers' conclusion must be based on facts, not assumptions). In other words, "police have a duty of further inquiry" when faced with "contrary facts tending to suggest that the person consenting to the search lacks actual authority." *Id.* at 272, 273 n.18. Absent those contrary facts or "surrounding circumstances [that] could conceivably be such that a reasonable person would doubt its truth," *id.* at 272, quoting *Illinois* v. *Rodriguez, supra*, an officer's conclusion that he has consent to enter a premises, if based on "facts, not assumptions or impressions," may satisfy the first of the two-part inquiry of due diligence. *Commonwealth* v. *Porter P., supra* at 271. See *Illinois* v. *Rodriguez, supra.*

"We evaluate the reasonableness of a police officer's conduct

based on the information available to him at the time, not on what we later learn to be true." *Commonwealth* v. *Porter P.*, *supra* at 270. "As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises?" *Illinois* v. *Rodriguez, supra*, quoting *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968). Here, the parties do not contest that the mother lacked actual authority to allow entry into the first-floor apartment.[10] Our inquiry therefore hinges on the sufficiency of the facts on which officers relied when they concluded that they had consent to enter the defendant's home.[11] See *Commonwealth* v. *Porter P.*, *supra* at 271.

Given the circumstances of this case, the judge did not err when she found there were sufficient facts affirmatively known by the police that justified their conclusion that the victim's mother had authority to grant entry into the defendant's home. Police went to the defendant's home after receiving a dispatch to an address close to the area they were patrolling. The officers knew they were responding to a 911 telephone call concerning the rape of a child. The person who had dialed 911 had given a street address, not an apartment number. The first two officers to arrive at the home were greeted on the porch by a woman who identified herself as the person who dialed 911 and indicated that the child who had been assaulted was inside. The woman opened the front door and led police through two open doors into the apartment where the victim was waiting. While it is best practice for police, prior to entry, simply to ask who is the resident of the home, particularly because "the purpose of the entry does not serve to vitiate the intrusion," *Commonwealth* v.

[10]A person has actual authority where he or she is "a coinhabitant with a shared right of access to the home," or has "a written contract entitling that person to allow the police to enter the home to search for and seize contraband or evidence." *Commonwealth* v. *Porter P.*, 456 Mass. 254, 264-265 (2010).

[11]Even though the judge implicitly found that the emergency situation justified the warrantless entry, the parties did not raise the issue whether the police legally entered the home under the emergency aid exception to the warrant requirement. See *Commonwealth* v. *Entwistle*, 463 Mass. 205, 213 (2012), cert. denied, 133 S. Ct. 945 (2013). We therefore do not address this issue here.

*Lopez, supra* at 390, citing *Commonwealth* v. *Forde*, 367 Mass. 798, 805 (1975), in this situation, which the judge found to be "an ongoing emergency, public and perhaps medical," the officers did not make further inquiry because they relied on sufficient, unambiguous facts to conclude that they had consent to enter the premises. Having satisfied the first prong of the diligent inquiry analysis under *Commonwealth* v. *Porter P., supra*, they did not need to conduct further inquiry. Cf. *Commonwealth* v. *Lopez, supra* (in nonemergency situation, police seeking hotel manager did not gain legal consent to enter from woman not known to police and whose relationship to premises was uncertain); *Commonwealth* v. *Rogers, supra* at 239, 241 (ambiguity regarding consent to enter premises existed where officers who arrived unannounced and did not identify themselves asked where they could find defendant, and person who answered their inquiry pointed inside).

  b. *Seizure of cushion cover.* The judge found that, given the legal entry into the grandmother's home, the seizure was also legal. Because the grandmother, who was the tenant of the first-floor apartment and the person with actual authority, "[did] not give any indication that there [was] a problem with the officers entering," and "readily agreed" to the seizure of the cushion cover, there was "no infirmity" when the police entered the home and seized the evidence. The judge also found that the officers had "good reason" to ask for the stained cushion cover, which they saw during their "initial emergency investigation" after "hear[ing] the account of the child . . . that a sexual act occurred on the couch."

  Citing *Wong Sun* v. *United States*, 371 U.S. 471, 487-488 (1963), the defendant argues that the judge erred when she did not suppress the evidence obtained from the cushion cover as "fruit of the poisonous tree" seized after an illegal entry. However, "[t]he doctrine of the fruit of the poisonous tree or primary illegality, as it is sometimes denominated, is not implicated if the tree is not poisonous." *Commonwealth* v. *Buchanan*, 384 Mass. 103, 108 (1981). We agree with the judge that the entry into the apartment was legal under the doctrine of apparent authority, and thus the seizure of evidence was also legal. Moreover, even if the entry had been illegal, police may gain

consent to search, as they did here, "from the individual whose property is searched." *Commonwealth* v. *Lopez*, 458 Mass. 383, 392 (2010), quoting *Illinois* v. *Rodriguez*, 497 U.S. 177, 181 (1990).

c. *Voluntariness of buccal swab.* The judge found that the consent to the buccal swab was "free and voluntary." Although the defendant did not receive the Miranda warnings prior to his signing the consent form, the judge determined that the defendant's command of English enabled him to understand the form he was signing and that "he was not under the influence of alcohol to the extent he was in anyway [*sic*] deprived of rational thought, of sensibility, [or] of understanding." Contrary to the defendant's assertions, the judge's findings are supported by the record. See *Commonwealth* v. *Prater*, 431 Mass. 86, 89-90 (2000). The grandmother testified that Spanish is the defendant's primary language, but the judge credited the officers' testimony that the defendant communicated with them in English, understood their requests made in English, was not too intoxicated to voluntarily sign the consent form, and understood what was being said to him. The judge "was satisfied beyond a reasonable doubt" that the defendant voluntarily consented and "understood what the form said." "Questions of credibility are the province of the motion judge who had the opportunity to observe the witnesses," *Commonwealth* v. *Watson*, 455 Mass. 246, 250 (2009). We accept the judge's findings. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990) (motion judge "entitled to credit the testimony of the police officers over the testimony of the father").

The defendant concedes that Miranda warnings are not required in these specific circumstances. See *Commonwealth* v. *Costa*, 65 Mass. App. Ct. 227, 231-232 (2005). Nonetheless, he argues that without Miranda warnings he was not aware that he could withhold his consent. This argument has no merit. "[K]nowledge of a right to refuse is not a prerequisite of a voluntary consent." *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 234 (1973). See *Commonwealth* v. *Rogers*, 444 Mass. 234, 237 n.4 (2005), quoting *Schneckloth* v. *Bustamonte*, *supra* at 229, 235 (requirement of "knowing and intelligent" waiver of right to refuse consent would create "artificial restrictions" on police conduct).

2. *Testimony at trial.* The defendant argues that testimony about the victim's appearance from the mother, who was not the first complaint witness, was an error of law that enhanced the victim's credibility and resulted in prejudicial error at trial. Because the jury did not convict the defendant of aggravated rape of a child, he claims that the jury may have doubted the victim's entire account had the mother's testimony been excluded.

Prior to trial, the parties had stipulated that the first complaint witness was the victim's grandmother.[12] The defendant now objects to the following testimony. The Commonwealth asked the mother, over the defendant's objection, to describe the victim's demeanor when he returned to the second-floor apartment. The mother stated that when the victim came upstairs and woke her, he was "pale in the face, like clammy, like he had seen a ghost, like just real clammy and pale in the face . . . kind of like sweaty, [and] startled," and that this was "unusual" for him. The mother also testified that she telephoned the police, that she saw the defendant in the police cruiser as she approached the ambulance, and that the victim was transported to a hospital.[13]

"The judge who is evaluating the facts of a particular case is in the best position to determine the scope of admissible evidence, keeping in mind the underlying goals of the first complaint doctrine," *Commonwealth* v. *Aviles*, 461 Mass. 60, 73 (2011), which are to "balance the interest of . . . a complainant (who, as here, may be still a child) in having [his] credibility fairly judged on the specific facts of the case . . . [and in] a defendant . . . receiv[ing] a trial that is free from irrelevant and potentially prejudicial testimony." *Commonwealth* v. *Arana*, 453 Mass. 214, 228 (2009). Generally, it is for the first complaint witness to describe the circumstances surrounding the

---

[12]At the hearing on the Commonwealth's motion to admit first complaint testimony, defense counsel, who had submitted a motion to exclude the introduction of additional complaint evidence, stated that his motion regarding first complaint testimony was a "nullity" because "it [had been] taken care of by the Commonwealth's motion [to admit first complaint testimony]." The judge therefore treated the defendant's motion to exclude additional complaint evidence as having been withdrawn.

[13]The victim's grandmother, who was the first complaint witness, testified that the victim had come into her room and told her that he had been raped. In accordance with *Commonwealth* v. *King*, 445 Mass. 217, 246 (2005), cert. denied, 546 U.S. 1216 (2006), the judge instructed the jury about first complaint testimony.

complaint, *id.* at 221, which may include "observations of the complainant during the complaint; the events or conversations that culminated in the complaint; the timing of the complaint; and other relevant conditions that might help a jury assess . . . the specific defense theories as to why the complainant is making a false allegation." *Commonwealth* v. *King,* 445 Mass. 217, 246 (2005), cert. denied, 546 U.S. 1216 (2006). This doctrine ensures that the defendant is not unfairly prejudiced by repetition of "often horrific details" of an alleged rape, and that the complainant's credibility is not enhanced unfairly. *Id.* at 243.

The first complaint doctrine, however, does not "prohibit the admissibility of evidence that, while barred by that doctrine, is otherwise independently admissible." *Commonwealth* v. *Arana,* *supra* at 220-221 (testimony about victim's demeanor admissible to rebut defendant's allegation victim's complaint was fabricated). See *Commonwealth* v. *Aviles, supra* at 75. In determining the admissibility of complaint testimony, judges should also look to "our guidelines for admitting or excluding relevant evidence." *Id.* at 73. See Mass. G. Evid. §§ 401-403 (2013). Our review whether the evidence served an evidentiary purpose "separate and apart from the first complaint doctrine," *Commonwealth* v. *Dargon,* 457 Mass. 387, 400 (2010), is to determine whether the judge's evidentiary ruling was an abuse of discretion. *Commonwealth* v. *Aviles, supra.*

The judge did not abuse her discretion when she allowed the Commonwealth to introduce the mother's testimony concerning the victim's demeanor. The mother did not testify in any detail as to what the victim told her concerning what had happened in the first-floor apartment. Rather, she described the victim's demeanor while he was talking to her and recounted her actions of telephoning the police. This testimony was relevant to rebut the defense's theory, proffered in opening statements and through cross-examination of the victim, that the entire event was fabricated.[14] See *Commonwealth* v. *Aviles, supra* at 67. See also *Commonwealth* v. *Lawton,* 82 Mass. App. Ct. 528, 536-537

---

[14]"Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, being unnecessarily time consuming, or needless presentation of cumulative evidence." Mass. G. Evid. § 403 (2013).

(2012) (testimony admissible to rehabilitate witness after impeachment evidence); *Commonwealth* v. *Hanino*, 82 Mass. App. Ct. 489, 497 (2012) (testimony of officers admissible to explain prior inconsistent statement). The evidence was also used to rebut the defense's suggestion that the victim did not seem upset when he spoke with his grandmother, who had testified that the victim was "calm" when speaking to her that night. See *Commonwealth* v. *Hall*, 66 Mass. App. Ct. 390, 395 (2006) (where defendant raised credibility issue of victim in rape case, Commonwealth could bring other complaint testimony relevant to timing of complaint). Further, the mother's testimony was relevant to the contested issues of the victim's state of mind following the crime, see *Commonwealth* v. *Arana, supra* at 225, and the timing and circumstances of police involvement in the case. *Id.* at 227. Because the mother's testimony did not repeat any details of the event, was relevant, and was not merely cumulative of the grandmother's testimony, the defendant was not unduly prejudiced. We see no abuse of discretion. See *id.* at 229.

3. *Conclusion.* We conclude that the judge did not err when she denied the defendant's motion to suppress evidence of the buccal swab and cushion cover because the entrance into the home was lawful, the person with actual authority granted consent to take the cover as evidence, and the defendant voluntarily consented to the taking of his DNA. We also conclude that the judge did not abuse her discretion when she allowed the mother's complaint testimony at trial.

*Judgments affirmed.*