SUPERIOR COURT 
 
 COMMONWEALTH vs. KAO LANOIS

 
 Docket:
 2477CR00470
 
 
 Dates:
 April 28, 2025
 
 
 Present:
 William F. Bloomer Justice of the Superior Court
 
 
 County:
 ESSEX
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Paper No. 9)
 
 

             Defendant Kao Langis ("Langis" or the "defendant") is charged with, inter alia, the unlawful possession of firearms and a large capacity feeding device. He moves to suppress evidence discovered by police during the warrantless search of a backpack found in his bedroom and other incriminating items subsequently seized pursuant to search warrants.
            On April 11, 2015, the court conducted an evidentiary hearing on Defendant' s Motion to Suppress Evidence (Paper No. 9) ("Motion"). The court heard testimony from Officer David
D' Angelo (" D' Angelo") of the Gloucester Police Department ("GPO"), and it received three exhibits in evidence. Langis did not testify.
            As more fully explained below, after consideration of the arguments of counsel and the evidence presented at the hearing, the Motion is DENIED.
FINDINGS  OF FACT
            The court makes the following findings, which are based on the credible evidence produced at the hearing and the reasonable inferences drawn from the evidence. Furthermore, the court finds that the testimony of D'Angelo was truthful and accurate on the relevant and material points set forth below.
 
                                                            -1-
 
            At approximately 11:00 p.m. on June 15, 2024, officers from the GPO were dispatched to the Heights at Cape Ann ("the Heights"), Building 4, Apartment #24, concerning a report of a suicidal male who had threatened to kill himself with a firearm. The Heights is a large housing complex consisting of twelve buildings with approximately twenty-four to twenty-six units per building. Upon their arrival at the Heights, D' Angelo and other officers met Gary Langis ("Gary") outside his apartment building.
            D' Angelo knew Gary and the defendant from having previously responded to a service call at the Heights in January 2024. At that time, Gary informed D' Angelo that he owned the apartment. He allowed Langis, his grandson, to stay there. Gary stated Langis had been living in his apartment for a short time after " bouncing around," having lived in New Hampshire and California.
            When D' Angelo and other officers arrived at the Heights on June 15, 2024, Gary informed the officers of events leading to the emergency call for police assistance. Gary stated he was seated on the balcony to his apartment earlier that evening when a dispute arose between him and his grandson. During the exchange, Langis placed a handgun against the side of his head and threatened to kill himself. Gary described the handgun as " blocky and dark" in appearance. He believed the firearm was real despite knowing Langis possessed "fake" handguns in his bedroom.
            Officers set up a perimeter around the building and initiated phone contact with Langis. After approximately thirty to forty-five minutes, Langis voluntarily exited the apartment. Sergeant Cimoszko and Officer Genovese spoke to him in the common area of the building. Langis refused officers' commands, refused to be handcuffed for his safety, and recorded his interaction with police on his cellphone. Once outside the building, officers escorted Langis to
                                                            -2-
 
an ambulance and accompanied him to a local hospital, where he was hospitalized pursuant to G.L. C. 123, § 12.
            Meanwhile, Sergeant Cimoszko handed D' Angelo a case containing a handgun. Sergeant Cimoszko told D' Angelo that Langis directed him to the case/handgun, which was located in the living room of the apartment. Langis told Cimoszko that the gun in the case was the same handgun he had placed to the side of his head earlier that night. D' Angelo, who is a firearm and armor instructor, examined the handgun and determined that it was a non-functioning firearm, using "blank" 9 millimeter cartridges. The handgun has a stainless-steel barrel and a wooden grip. See Exhibit 1 (photo of handgun). It did not match the description of the handgun provided by Gary. D' Angelo showed the handgun to Ga1y, who examined it and stated he did not believe it was the handgun Langis held to his head earlier that night but could not be certain. Gary explained that the color and shape of the gun were different than the handgun Langis used to threaten suicide. Gary therefore became concerned that another firearm was located in his residence.
            D' Angelo asked Gary if he would consent to a search of his apartment for firearms. Gary consented, stating that he did not want any firearms in his house and that officers could "do whatever you need to do." Gary told D' Angelo he had keys to the apartment if police needed to enter the premises. He accompanied D' Angelo and other officers into the building and led them to his residence. The door to the apartment was open. Gary then directed D' Angelo and other officers to Langis ' s bedroom. He did not place any restrictions or limitation s on the officers' search. Officers searched the room for a firearm. D' Angelo looked underneath a bed and observed a backpack, which he removed. D' Angelo opened the top flap of the backpack and
 
                                                            -3-
 
observed a nylon bag inside seated atop a couple of cardboard boxes. D' Angelo unzipped the nylon pouch and saw two frames for pistols - one black and another white in color. [1]
            Based on his training and experience, D' Angelo recognized the black pistol frame to be a "polymer 80" frame, which is a "ghost gun" frame. He observed the white pistol frame to be 3D printed. D' Angelo explained that the frames found in the backpack had trigger housings already installed in them. The only parts needing installation to make the frames functional firearms were the slide and the barrel set up. Upon recognizing that these were "firearms parts," D' Angelo and other officers immediately stopped their search, exited the bedroom, and contacted detectives to apply for a search warrant. Police secured the apartment.
            Detective Thomas Quinn ("Quinn") applied for and received a warrant to search Langis's bedroom for firearms, firearm pieces, frames, slides, and ammunition.  See Exhibit 2.  A search of the bedroom pursuant to the warrant uncovered firearm assembly parts and tools, a high- capacity magazine, boxes of ammunition, gun conversion assemblies, wooden pistol grips, and other firearm related items. Quinn later obtained a second warrant to search a black portable safe recovered from Langis's bedroom and believed to contain a firearm. See Exhibit 3. A search of the lockbox uncovered a black ghost gun with a purple grip and no serial numb er as well as a clear plastic magazine containing nine rounds of ammunition.
CONCLUSIONS  OF LAW
            Langis argues the police unlawfully conducted a warrantless search of his bedroom and backpack. He urges this court to suppress any evidence seized during that warrantless search as well as all items seized during the execution of the two search warrants as fruit of the poisonous tree. For its part, the Commonwealth argues that Gary, the owner of the dwelling , gave consent
 
--------------------------------------------
 
[1] D'Angelo explained that the frame for a pistol is the lower half of the handgun which houses the trig ger and magazine. It docs not include the slide.
 
                                                            -4-
 
to the police to search his residence for firearms without placing any restrictions or limitations on the scope of the search.
            I. CONSENT TO SEARCH
            " Article 14 [of the Massachusetts Declaration of Rights] like the fourth Amendment to the United States Constitution, guarantees 'a right to be secure from all unreasonable searches ... and seizures."' Commonwealth v. Buckley, 478 Mass. 861, 865 (2018). Historically, the Massachusetts Declaration of Rights has protected the home from warrantless intrusion by the government, subject to carefully delineated exceptions. Commonwealth v. Alexis, 481 Mass. 91, 96 (2018) (citations omitted). "A 'warrantless government search of a home is presumptively unreasonable under the fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.' ... " Commonwealth v. Arias, 481 Mass. 604, 609 (2019), quoting Commonwealth v. Tyree, 455 Mass. 676, 683 (2010).
            As a threshold matter, the Commonwealth does not contest that Langis had a reasonable expectation of privacy in his bedroom and the backpack found under his bed. Consequently, a search in the constitutional sense occurred when D' Angelo and other officers entered the bedroom without a warrant, looked under the bed, removed the backpack and examined its contents. See Garcia v. Commonwealth, 486 Mass. 341, 350 (2020) (search by government occurs "when it intrudes on a 'subjective expectation of privacy ... that society is prepared to recognize as reasonable."') (citation omitted). In these circumstances, " the Commonwealth bears the burden to establish that a warrantless search fell within an exception to the warrant requirement." Commonwealth v. Davis, 481 Mass. 210, 217 (2019) (citations omitted).
            Here, the Commonwealth argues the search of the bedroom and backpack were justified pursuant to the consent exception to the search warrant requirement. In such an instance, "[t]he
 
                                                            -5-
 
Commonwealth bears the burden of proving that consent was freely and voluntarily given." Commonwealth v. Colon, 482 Mass. 162, 185 (2019) (citation omitted). Consent to search need only be given freely and voluntarily, not knowingly and intelligently. Id. Based on the totality of the circumstances, this court has little difficulty concluding Gary's consent to search his apartment was "unfettered by coercion, express or implied, and also something more than mere acquiescence to a claim of lawful authority."' Commonwealth v. Ortiz, 478 Mass. 820, 823 (2018) (quotations and citations omitted). Shortly after witnessing his grandson threatening to kill himself with a handgun, Gary told police that he did not want any firearms in his residence and authorized police to do whatever they needed to do to locate and remove firearms from his home. There is no evidence that Gary was impaired in any fashion or that officers engaged in any form of coercion or trickery to obtain his consent. There also is no evidence that police exceeded the scope of Gary's consent to search after he directed them specifically to Langis's bedroom. See Commonwealth v. Hinds, 437 Mass. 54, 59 (2002) (court must evaluate all circumstances to determine whether reasonable person would be warranted in belief that consent giver placed some limitations on search).
            II. AUTHORITY TO CONSENT
            The critical question here is whether Gary, as owner of the premises who shared the apa11ment with his grandson, had actual or apparent authority to consent to the search of Langis's bedroom and the backpack found under the bed. Langis docs not challenge the reasonableness of the officers' belief that Gary had actual authority to allow police entry into the apartment. Sec Commonwealth v. Lopez, 458 Mass. 383, 393-394 (2010) (extending actual or apparent authority needed to conduct warrantless consensual search of home to warrantless consensual entry of home). Rather, Langis argues that Gary did not have joint access or control over his bedroom
 
                                                            -6-
 
and therefore he could not consent to a warrantless search by police of the room or the backpack under his bed.
            Generally speaking, "actual authority" to give consent may be obtained from the individual whose property is to be searched, Illinois v. Rodriguez, 497 U.S. 177, 181 (1990), or from a third party possessing "common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). "Common authority" is "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any or all of the inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 171 n.7.
            In Commonwealth v. Porter P., the Supreme Judicial Court ("SJC") recognized, "[a] third party has actual authority to consent to a warrantless search of a home by the police when the third party shares common authority over the home." 456 Mass. 254, 262 (20 I 0) (citations omitted). In Porter P., the SJC "declared under art. 14 that a person may have actual authority to consent to a warrantless search of a home by the police only if (1) the [consenting] person is a coinhabitant with a shared right of access to the home, that is, the person lives in the home, either as a member of the family, a roommate, or a houseguest whose stay is of substantial duration and who is given full access to the home ...." 456 Mass. at 264-265.[2]
            Langis argues that although "a third-party cohabitant" like Gary may consent to a search of the residence, the scope of the consent extends only to common or "shared spaces," and not to his bedroom or the backpack found under his bed. It is well settled, however, that cohabitant
 
--------------------------------------------
 
[2] The second prong articulated in Porter P. has no application to this case. It provides in the alternative , "(2) the person, generally a landlord, shows the police a written contract entitling that person to allow the police to enter the home to search for and seize contraband or evidence."
 
                                                            -7-
 
relatives such as a parent, spouse, or sibling may consent to the search of the home or bedroom, including unlocked containers, where their adult child resides. See Commonwealth v. Santos, 97 Mass. App. Ct. 719, 724 (2020) (noting "a parent may validly consent to a search of a room occupied by an adult child within the parent's home"); Commonwealth v. Farnsworth, 75 Mass. App. Ct. 87, 96-98 (2010) (defendant's mother's consent to search defendant's bureau and strong box in bedroom area upheld); Commonwealth v. Ortiz, 422 Mass. 64, 70 (1996) (defendant's father's consent to search bedroom in father's home valid even if defendant had possessory interest in room); Grasso, Suppression Matters,§ 11-2[b] (2022 Ed.) (relatives such as parent, spouse, or sibling may consent to search of home or room where defendant resides) (and cases cited).[3]
            The two cases Langis cites in his memorandum in support of suppression do not involve cohabitants whatsoever, sec Lopez, 458 Mass. at 395 (unknown woman who opened door to defendant's motel room/residence did not have apparent authority to consent to officer's warrantless entry and subsequent seizure of firearm); Porter P., 456 Mass. at 257-258 (police believed family shelter director had authority under resident manual' s rules and regulations to consent to search of juvenile's room).
            The third case Langis cites does not involve a parent-child (or grandparent-grandchild) relationship between individuals sharing a dwelling. See Commonwealth v. Hernandez, 93 Mass. App. Ct. 172 (2018) (cohabitant consenting adult shared one-bedroom apartment with nonconsenting adult and their children). The Appeals Court in Hernandez held that the defendant's cohabitant could validly consent to the warrantless search of a closed, unlocked suitcase located in a common closet she shared with the defendant. Id. at 178. The Court stated
 
--------------------------------------------
 
[3] The court discerns no logical reason to exempt a grandparent-grandchild relationship from this legal tenet, particularly in the context of this case.
 
                                                            -8-
 
that cohabitants "can consent to searches in areas where they have 'joint access or control for most purposes," observing that the cohabitants have a "greatly diminished expectation of privacy" with respect to themselves and such areas, and that the defendant "assumed the risk" that his cohabitant would access the closet and unlocked suitcase or consent to their search. Id. at 177.[4]
            The result reached in each case obviously is fact driven. Here, Gary owned the apartment, lived there himself , and permitted his grandson to stay in a bedroom after the defendant had been nomadic for a period. There is no indication that Langis paid rent or that he took efforts to exclude Gary and others from his bedroom, either by locking the bedroom door or otherwise. Police freely accessed the defendant' s bedroom at Gary's direction and the backpack itself was not a locked container. Gary placed no restrictions on the scope of the search and, in fact, encouraged the police to "do whatever [they] need to do" to find and remove any firearm from his apartment after Langis had threatened to kill himself with a handgun.[5] In these circumstances, Langis assumed the risk that his grandfather/ owner of the home would access and inspect his bedroom and belongings or consent to their search or inspection.
            At bottom, D' Angelo and other officers acted reasonably in conducting the search of the bedroom and backpack. "Regardless of how finely the law of search and seizure is parsed and labeled, the ultimate touchstone of art. 14 and the Fourth Amendment is whether a search or
 
--------------------------------------------
 
[4] The Court also rejected the defendant's argument that Porter P. disallowed one cohabitant's consent to search another cohabitant's closed suitcase, noting Porter P. did not involve consent given by a cohabitant and the cases cited by Hernandez addressed the relationship between a homeowner and an occasional guest. Hernandez, 93 Mass. App. Ct. at 177.  The same reasoning applies in the  instant case. 5 Although the emergency had resolved with Langis's transport to the hospital, Gary nonetheless sought officers' assistance in removing any firearms from his residence . It is not a stretch to infer Gary was concerned about Langis returning to the apartment at some point and accessing a firearm. It is also worth noting that G.L. c. 123 , § l 2(a) limits involuntary hospitalization to three days. At the end of the three- day period, the person must be discharged from the facility unless a longer period of commitment is sought by the facility under G.L. c. 123, §§ 7 or 8.
 
                                                            -9-
 
seizure was reasonable in the circumstances." Commonwealth v. Moore, 54 Mass. App. Ct. 334, 340 (2002). Officers appropriately stopped any further search of Langis's bedroom to seek a warrant once the nature of the search had morphed from a search for a firearm (possession) to a search for firearm assembly parts (manufacturing). They also obtained a second warrant to search a lockbox for additional firearms.
            Assuming arguendo that Gary did not have actual authority to consent to a search of the apartment, police nevertheless were justified in believing he had apparent authority to consent to the search. In Porter P., the SJC adopted under art. 14 of the Massachusetts Declaration of Rights the doctrine of apparent authority in the context of consent searches. 456 Mass. at 269. The SJC in Porter P. stated, "We do not believe that art. 14 is violated if a warrantless search of a home occurs after a police officer obtains the voluntary consent of a person he reasonably believes, after diligent inquiry, has common authority over the home, but it turns out that the person lacked common authority. . . . Apparent authority in the context of consent to search is a police officer' s finding of actual authority based on a reasonable mistake of fact." Id. at 271. It is judged against an objective standard, that is, "would the facts available to the officer at the moment ... warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises?"' Commonwealth v. Santos, 97 Mass. App. Ct. 719, 721 (2020). "The critical inquiry ... is the relationship between the third party and the premises." Lopez, 458 Mass. at 393 (citation and internal quotation omitted).
            Here, D' Angelo had prior dealings with Gary six months before the reported incident of threatened suicide. He knew from his conversations with Gary that Gary was the owner of the apartment. On the night of the incident, Gary volunteered to give police the keys to his apartment so they could make entry and accompanied officers to the apartment after Langis was
 
                                                            -10-
 
transported to the hospital. He directed officers to Langis's bedroom. No forced entry into the bedroom was required, and there is no evidence before the court Langis excluded his grandfather, by means of locks or otherwise, from the bedroom in which his grandfather permitted him to stay. In these circumstances, a reasonably cautious person would conclude that Gary had authority over the entire premises, including Langis's bedroom. The two-step "diligent inquiry" required of police in Porter P., later clarified in Commonwealth v. Santos, 465 Mass. 689 (2013), was satisfied. D' Angelo and other officers relied on facts, not assumptions or impressions, to base their conclusion that Gary had authority to consent to the search, and they were presented with no "'contrary facts tending to suggest that the person consenting to the search lack[ed] actual authority."' Santos, 465 Mass. at 694.[6]
            Considering all the circumstances here, the court concludes D' Angelo and other officers reasonably believed Gary had actual or apparent authority to consent to the search of his entire apartment, including his grandson's bedroom and the backpack located under the bed. Because the search of the backpack was constitutionally permissible, the subsequent searches were not tainted by adulterated fruit and suppression of evidence seized pursuant to the warrants is not required. Wong Sun v. United States, 371 U.S. 471, 487-488 (1963); see Commonwealth v. Buchanon, 384 Mass. 103, 108 (1981) ("doctrine of the fruit of the poisonous tree ... is not implicated if the tree is not poisonous.").[7]
 
--------------------------------------------
 
[6] The Court in Santos, citing Porter P., explained, " Diligent inquiry consists of two steps: first, 'the police officer must base his conclusion of actual authority on facts, not assumptions or impressions ,' and second, 'even when the consenting individual explicitly asserts  that he lives there, if the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth, the police officer must make further inquiry to resolve the ambiguity."' 465 Mass. at 695.
[7] Citing Commonwealth v. Pearson, 486 Mass. 809 (2021), the defendant argues that evidence seized pursuant to the search warrants must be suppressed as fruit of the poisonous tree.  Langis posits no additional argument that the warrants lac ked probable cause or were otherwise deficient if the earlier consent search was ruled legal.  Any such argument therefore is deemed  waived.   See  Mass.  R. Crim P.  I 3(a)(2).
 
                                                            -11-
 
ORDER
            For the above reasons, it is HEREBY ORDERED that Defendant's Motion to Suppress Evidence (Paper No. 9) is DENIED.